No. 46,031

STATE OF KANSAS, *Appellee,* v. ROBERT B. CAMPBELL, *Appellant.*

(500 P. 2d 21)

Opinion filed July 24, 1972.

*Christopher J. Redmond,* of Redmond and Redmond, of Wichita, argued the cause and was on the brief for the appellant.

*Keith Sanborn,* County Attorney, argued the cause, and *Vern Miller,* Attorney General, and *Stephen M. Joseph,* County Attorney Legal Intern, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a criminal action in which Robert B. Campbell (defendant-appellant) was charged with the offenses of assault with felonious intent (K. S. A. 21-431), first degree kidnapping (K. S. A. 21-449), first degree murder (K. S. A. 21-401) and first degree robbery (K. S. A. 21-527).

A jury found the defendant guilty of the four crimes with which he was charged. The defendant was sentenced to two terms of life imprisonment, one for the crime of murder and the other for the crime of kidnapping. The defendant was also sentenced to confinement for a period of not less than ten years nor more than twenty-one years for the crime of robbery, and for a period not exceeding ten years for the crime of felonious assault. The trial court ordered the four sentences to be served consecutively.

The defendant has duly perfected an appeal from the judgment and sentences of the district court of Sedgwick County, Kansas.

A recitation of the facts as disclosed by the evidence presented at trial is essential for an understanding of the issues.

The appellant and his cousin, John Hendren, arrived at the home of Chester Mefford in Wichita, Kansas, at approximately 5:00 o'clock p. m. on February 12, 1969. During the course of the visit Mefford's attention was drawn to a window by a passing automobile. After looking out the window, Mefford stated the passing auto belonged to a Kenneth Ketter, who, according to Mefford, had been causing him some trouble. Mefford asked Hendren if they could follow Ketter in Hendren's car and Hendren replied in the affirmative.

The trio followed Ketter's auto for some time, then lost sight of it, and eventually spotted it parked at an APCO service station located at the intersection of Kellogg and Pattie Streets in Wichita.

At this time, Hendren stopped his auto across the street and they began watching the station. When Hendren told Mefford and the appellant he had to proceed home, Mefford borrowed a

dime, left the car, and placed a phone call from a nearby pay phone. Upon his return to the car, Mefford stated that two guys were coming by to pick him up soon. Sometime after 6:00 o'clock p. m. a 1966 Pontiac GTO arrived with three persons in it. They were Ralph Cluck (the owner and driver), John Phillips and Preston Haze. They had come in response to Mefford's call.

The appellant and Mefford joined Cluck, Phillips and Haze in the GTO and the five undertook various sidetrips not material to this appeal. Eventually the group stopped at a tavern on South Hydraulic Street in Wichita which they left at approximately 8:45 o'clock p. m. Appellant and the others returned to the APCO service station to find Ketter's auto was gone. After stopping, the appellant and Phillips entered the station and made inquiries about Ketter. When the pair returned to Cluck's auto, the appellant boasted that he had found out everything about Ketter except his social security number. The appellant had been told Ketter lived only one-half block from the service station, at 414½ Pattie Street.

The five left the service station and drove down the alley behind Ketter's home two or three times. They next proceeded to take Preston Haze home.

After dropping Haze off at his home, Mefford stated he was going to return to Ketter's house that night. The appellant then said he had a pistol at his house, whereupon the four proceeded to the appellant's house.

The appellant's pistol was not there; however, he did pick up a .410 gauge shotgun.

Cluck next drove to the home of the appellant's mother where the appellant obtained his pistol from his wife's car. The pistol was a .22 caliber Ruger automatic.

As the four were returning to Ketter's house they observed Ketter leaving in his auto. They followed him to a nearby grocery store where they watched him for a short time. The appellant suggested they leave, return to Ketter's house, and wait for him to return. They decided to do so and Cluck parked on Lewis Street at the end of the alley which ran behind Ketter's house.

Cluck remained in his car while the appellant, Mefford and Phillips got out and walked down the alley to Ketter's house. The appellant carried his pistol part of the way and then gave it to Phillips. After they had waited in the doorway at the rear of

Ketter's house a short time, Ketter drove down the alley and parked his car in the driveway.

As Ketter was getting out of his car, the appellant walked over to him and engaged him in conversation. Then, without warning, the appellant knocked Ketter to the ground, whereupon Mefford held Ketter's feet and the appellant held Ketter's shoulders while Phillips beat Ketter senseless by striking him on the head with the pistol.

Approximately five minutes after leaving Cluck's car, the trio returned carrying Ketter face down; Mefford had Ketter's shoulders and the appellant had his feet. They placed Ketter on the floor of the back seat and drove to Kellogg Street where they began driving in a westerly direction. After several miles had been traveled Cluck turned south on Kansas Highway No. 42. While traveling in a southeastern direction on K-42, Phillips inspected Ketter's billfold and, finding it contained three dollars, he gave two dollars to Cluck and kept one for himself. As they passed over the "twin bridges" on K-42, Phillips threw the billfold out of the car.

Cluck drove on to a point approximately one-half mile south of the bridges where he turned onto a dirt road. Chuck drove another one-half mile on the dirt road and then stopped.

All four got out of the car and carried Ketter for approximately half a mile across the fields, pulling him under several fences in the process. The appellant was carrying the shotgun and the pistol. Coming to a small creek about twenty to forty feet wide, they laid Ketter face down on the ground by the water.

At that point Mefford said, "Let's turn him over on his back, I'm going to do him in right now." The appellant pulled out his pistol as Mefford rolled Ketter over, and put it up to Ketter's head. Mefford straddled Ketter's body, clicked open his knife, and raised his arm to stab Ketter in the chest. As he did so, Ketter raised himself a few inches off the ground and tried to grasp Mefford's wrist. The appellant then shot Ketter in the head. After the shot Mefford stabbed Ketter several times. Mefford observed, "This guy sure is tough, he bent my knife." The appellant, Mefford and Phillips undressed Ketter's body. Mefford stabbed Ketter's body one last time and then he and the appellant hoisted Ketter's body and threw it into the water four or five feet from the bank.

The appellant put the pistol in his pocket, picked up the shotgun, and all four returned to the car. Mefford and Phillips carried Ketter's clothes. After reaching the car, Cluck put Ketters clothes and

the back seat floor mat into a box in his car trunk. They returned to K-42 and began driving back to Wichita. Recrossing the "twin bridges," Cluck saw Ketter's billfold lying in the road; he stopped the car and retrieved it.

Cluck drove through Wichita into the county north of the city. Various items were thrown from two bridges in that area, including Ketter's clothes and shoes, Mefford's knife, Campbell's pistol and some of his own clothes, and the floor mat from Cluck's car. Cluck then returned to Wichita and took the appellant, Mefford and Phillips home. Before going to bed, Cluck burned Ketter's billfold.

The appellant, Cluck and Mefford were soon apprehended in Wichita. Phillips was arrested at the home of relatives near Redrock, Oklahoma, where he had been hiding.

## I.

The appellant first contends the trial court erred in denying him a representative jury in violation of his constitutional rights because the trial court excluded ten jurors who stated they had an aversion to capital punishment.

The Supreme Court of the United States has held that a death sentence cannot be constitutionally imposed by a jury from which jurors have been removed because they are opposed to capital punishment or have conscientious scruples against imposing the death penalty. (*Witherspoon v. Illinois,* 391 U. S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770; *Bumper v. North Carolina,* 391 U. S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788; *Maxwell v. Bishop,* 398 U. S. 262, 26 L. Ed. 2d 221, 90 S. Ct. 1578; and *Boulden v. Holman,* 394 U. S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138.) This court has adhered to the rule in *Zimmer v. State,* 206 Kan. 304, 477 P. 2d 971; *State v. Roth,* 207 Kan. 691, 486 P. 2d 1385; and *State v. Theus,* 207 Kan. 571, 485 P. 2d 1327.

The appellant was not given the death penalty in this case, but he contends due to the fact that ten jurors were excused as having an aversion to capital punishment, the jury selected was an unrepresentative jury on the issue of guilt and as such increased the risk of conviction. The appellant concedes that no testimony was introduced at the trial to support his contention, but requests the court to consider the theory presented in various law review articles. ("New Data on the Effect of a 'Death Qualified' Jury on the Guilt Determination Process" by George L. Jurow [84 Harv. L. Rev. 567]; "On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen" by

Edward J. Bronson [42 Colo. L. Rev. 1]; "Toward Expansion of *Witherspoon*: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law" by Faye Goldberg [5 Harv. Civil Rights Civil Liberties L. Rev. 53]; and "Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?" by Walter E. Oberer [39 Tex. L. Rev. 545].)

The *Witherspoon* decision is not applicable because the death penalty was not imposed upon the appellant in this case. (*Bumper v. North Carolina*, supra.) As to the issue of guilt, there is no presumption that a "death qualified" jury is unrepresentative; the burden is clearly upon the appellant to prove such an allegation. (*Bumper v. North Carolina*, supra; *Turner v. State*, 208 Kan. 865, 494 P. 2d 1130; and *Zimmer v. State*, supra.) The appellant having failed to prove that the jury was unrepresentative on the issue of guilt, the constitutional rights of the appellant have not been infringed and his attack upon the jury must be rejected.

It may be conceded that qualification of the jurors by removing those who expressed conscientious or religious scruples against the death penalty was erroneous. However, the record does not disclose the appellant was prejudiced by reason thereof.

## II.

The appellant contends he was denied a fair trial because a sample of his blood was taken and typed and physical measurements were made of him in violation of his constitutional rights by their subsequent admission in evidence.

It appears from the appellant's brief he has abandoned any objection to the taking of his physical measurements, and there is nothing in the record to disclose that such measurements were introduced in evidence.

Four days after the murder of Kenneth Ketter a blood sample was taken from the appellant at the Sedgwick County jail by Richard Danielson, a qualified medical technologist of the Wichita Clinical Laboratories. Linda Morgan, a chemist with the Wichita police department, accompanied Danielson to the jail and assisted him in taking the sample. She informed the appellant that she was to take a sample of blood and the appellant made no objection. His attorney was not present. Miss Morgan later tested and typed the blood sample. At the trial Miss Morgan testified that the appellant had international blood type O. This evidence was admitted by the trial

court over an ambiguous objection advanced by the appellant. The appellant contends the admission of such evidence was erroneous in that it violated several of his constitutional rights.

After carefully reviewing the record presented on appeal, we fail to see the relevance of this evidence on the issue of the appellant's innocence or guilt. The victim's blood type was determined to be AB. The record discloses blood of the type AB was found on Mefford's shoes, on Phillips' jacket, and on the red floor mat and on the hinge of the Pontiac GTO owned by Cluck. There is evidence in the record of blood spots on a white handkerchief which were type O, but there is no evidence linking the white handkerchief to the appellant. When the appellant took the stand and testified in his own behalf, he testified he wiped Ketter's bloody head with his own bandana handkerchief. He further testified that he threw his own jacket, jeans, shirt and shoes in the river. Nothing in the record indicates that these items of clothing or shoes were recovered or that any blood was found on the appellant's clothing.

Under these circumstances the admission into evidence of the results of the blood grouping test made upon a sample of the appellant's blood, even if erroneous, was harmless error. It did not deny the appellant a fair trial.

An extended discussion of the various constitutional points asserted by the appellant, some of which were argued at the trial, would be purely academic. (See *Schmerber v. California*, 384 U. S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826.)

Both Mefford and Cluck testified on behalf of the state in the case and implicated the appellant from the witness stand as a full and active participant in the crimes with which he was charged. The appellant took the witness stand in his own defense and to a large extent corroborated the testimony of Mefford and Cluck, except for the actual shooting of the victim.

Tainted evidence consisting of the results of a blood grouping test, purported to be in violation of *Mapp v. Ohio*, 367 U. S. 643, 6 L. Ed. 8d 1081, 81 S. Ct. 1684, was said to be harmless beyond a reasonable doubt in *Harrington v. California*, 395 U. S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726, where the direct evidence against the defendant in the form of in-court testimony of his confederates was overwhelming.

### III.

The appellant contends the trial court erred in refusing him funds with which to employ extra witnesses and investigators to

corroborate his theory of the case; that this constituted economic discrimination and thereby prejudiced him from receiving a fair trial.

The appellant relies upon *Griffin v. Illinois*, 351 U. S. 12, 100 L. Ed. 891, 76 S. Ct. 585, for the proposition that in criminal trials a state can no more discriminate on account of poverty than on account of religion, race or color; and that the ability to pay costs in advance bears no rational relationship to a defendant's guilt or innocence and cannot be used as an excuse to deprive a defendant of a fair trial.

The *Griffin* case was decided on the ground that indigent defendants on appeal to the highest court of the state were entitled to a *trial transcript,* which is not the proposition here presented. Here the appellant contends that:

". . . due to the failure of the trial court to permit funds to be allowed for an in-depth statement of Dr. Kurth's findings as to the mental status of the defendant, or in the alternative, to have Dr. Ralph L. Drake examine the appellant to determine his mental state, then the appellant asserts his defense of insanity was abrogated without any means of determining on what basis Dr. Kurth found the appellant to be competent, and such abrogation was due to the lack of financial resources and in fact constituted economic discrimination in prohibiting the appellant from receiving a fair trial."

A recital of the facts is necessary to adequately answer the appellant's contention. On March 17, 1969, the appellant requested the trial court to appoint a commission pursuant to K. S. A. 1968 Supp. 62-1531 (Repealed L. 1970, ch. 129, § 22-4604) to inquire into his competency to stand trial and assist in the preparation of his defense. The appellant also requested the court to provide funds "equal to that used by the state in preparation of its case in order to adequately prepare his own case." The trial court denied the appellant's request for funds, but did appoint Dr. C. J. Kurth on March 26, 1969, as a commission to examine the defendant "to determine whether or not he is insane, an idiot, or an imbecile and whether or not he is able to comprehend his position and assist counsel in his defense, and to report back in writing his findings to this court."

Dr. Kurth filed his report indicating that the appellant was competent to stand trial and assist in his defense.

On May 7, 1969, the appellant moved the trial court to provide him with a copy of Dr. Kurth's report and to provide funds for an examination of the appellant by Dr. Ralph L. Drake and by the

Wichita Psychiatric Center regarding his mental state, before, during and after the crimes with which he was charged, including an electroencephalogram examination. The request for funds was denied, but the record tends to show the appellant received a copy of Dr. Kurth's report.

Defense counsel was advised by Dr. Kurth on May 28, 1969, that he would be available to discuss certain aspects of the appellant's character, but that this would have to be done by deposition. The appellant did not depose Dr. Kurth, claiming at the trial this was the result of insufficient funds. At the trial, defense counsel renewed his motions for funds.

This court has held that the granting or denial of a motion to provide supporting services to counsel for an indigent defendant in a criminal prosecution is a matter within the discretion of the trial court. Its ruling will not be disturbed in the absence of a showing that the exercise of such discretion has been abused to the extent of prejudicing the substantial rights of the defendant. (*State v. Taylor*, 202 Kan. 202, 447 P. 2d 806; *State v. Young*, 203 Kan. 296, 454 P. 2d 724; and *State v. Frideaux*, 207 Kan. 790, 487 P. 2d 541.)

K. S. A. 1971 Supp. 22-4508 now provides for investigative services for indigent defendants, but the trial court must determine such services are "necessary," which is in accordance with prior case law.

In July, 1969, when this case came on for trial the appellant renewed his request for funds and K. S. A. 1971 Supp. 22-4508 authorizing such expenditures, had become operative. (L. 1969, ch. 291, § 8, effective July 1, 1969.)

Both before and after the effective date of 22-4508, *supra*, the burden was upon the appellant to show that the request for services was necessary, and on appeal that the denial of such request by the trial court prejudiced his substantial rights.

The appellant has made no attempt in his brief to sustain this burden. At best, the appellant suggests that absent Dr. Drake's services, or Dr. Kurth's deposition, he had no way of knowing whether the defense of insanity was available.

The mere hope or desire to discover some shred of evidence when not coupled with a showing that the same is reasonably available and necessary for a proper defense does not support a claim of prejudicial error. (*State v. Taylor*, supra.)

When a similar issue was raised before the Tenth Circuit Court of Appeals in *Watson v. Patterson,* 358 F. 2d 297 (10th Cir. 1966), the Court of Appeals noted that it was unable to find any cases holding that the appointment of experts was a constitutional requirement; rather, the court held that requests for supporting services were to be measured by the requirements of due process, and the test of due process was "fundamental fairness."

Here the trial court appointed a sanity commission pursuant to the appellant's request, and the report of the commission disclosed the appellant was competent to stand trial. Being dissatisfied with the report the appellant sought funds for additional psychiatric testimony, but was unable to convince the trial court of its necessity. We cannot say the trial court erred in determining the matter of necessity and in exercising its power of discretion. Under the circumstances related it does not appear that the substantial rights of the appellant were prejudiced.

IV.

The appellant contends the trial court erred in the admission of photographs of the deceased other than state's Exhibit No. 106, which was used for the purpose of identification. He contends these photographs were used solely for the purpose of inflaming the jury; they prejudiced him, and thereby denied him a fair trial.

The twenty photographs and seven colored transparencies admitted in evidence are referred to by the appellant as exhibits which were repetitious, excessive and beyond all probative value, and were used solely for the purpose of inflaming the jury.

Exhibits, be they pictures or otherwise, which are relevant and material to the matters in issue, are not rendered inadmissible merely because they may be shocking or gruesome. Where the defendant is charged with a crime of violence, colored slides are relevant and admissible if they tend to establish the violence which was alleged. (*State v. Hill,* 193 Kan. 512, 514, 394 P. 2d 106.)

Even though gruesome, photographs properly identified, as representing physical objects which constitute a portion of a transaction which serve to unfold or explain it, may be exhibited in evidence whenever the transaction is under judicial investigation. (*State v. Booker,* 200 Kan. 166, 168, 434 P. 2d 801.) Photographs admitted for the purpose of identifying the victim and to portray the facts described by a pathologist witness concerning the autopsy per-

formed on the body of the victim are relevant and admissible. (*State v. Turner*, 193 Kan. 189, 199, 392 P. 2d 863.)

Even where the defendant concedes the victim's death and the cause of death, it is incumbent upon the prosecution to prove as a part of its case in chief all elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death, and the violent nature of the death, and to corroborate the testimony of other witnesses, are relevant and admissible. (*State v. Johnson*, 201 Kan. 126, 129, 439 P. 2d 86; and *State v. Martin*, 206 Kan. 388, 390, 480 P. 2d 50.)

All of the state's photographic exhibits disputed by the appellant were relevant to the issues on trial in this case and were admissible. The colored slides were used extensively by Dr. William Eckert, a pathologist, in describing the wounds to the victim's body, the manner and cause of death, and the probable circumstances surrounding the death. Other photographs were offered to show the examination of the victim's body in sequence. Some of the exhibits corroborated the testimony of the state's witnesses.

In an abundance of caution the trial court instructed the jury that it should not permit the photographic exhibits to cause any bias, passion or prejudice in their minds.

We cannot say, after reviewing the entire record, the admission of the photographic exhibits and transparent slides into evidence denied the appellant a fair trial.

## V.

The appellant contends the trial court erred:

". . . in admitting much of the State's evidence for the purpose of showing conspiracy between the defendant and others, notwithstanding the fact the defendant was not charged with a conspiracy and the admission of such evidence denied the defendant the safeguards which exist under the substantive law of conspiracy, as well as making statutory provisions for separate trials of joint defendants in a felony case completely and wholly meaningless."

The appellant contends the trial court should have determined *prima facie* whether or not a conspiracy existed and, if so, when the conspiracy terminated in order to rule whether statements made by Mefford and Cluck and the acts of Phillips in Oklahoma were admissible against the appellant.

The appellee argues that at no time during the course of the trial did the appellant voice the objections to the testimony now

asserted on appeal, *i. e.*, that it allowed admission of statements of a co-conspirator made after the termination of the conspiracy. This point is well taken.

Nevertheless, we perceive a more substantive reason for affirming the trial court's decision to admit the testimony of Ron Thomas, Wylarma Phillips and Floyd Hannon.

This court in *State v. Borserine*, 184 Kan. 405, 337 P. 2d 697, said:

". . . Evidence of the acts and declarations of the co-conspirators, done and made in the absence of the accused, is admissible so far as it pertains to the furtherance of the common criminal design, to its consummation, to the disposition of its fruits, *and to acts done to preserve its concealment*, as an exception to the rule against the admissibility of hearsay evidence. (*State v. Emory*, 116 Kan. 381, 226 Pac. 754, and cases cited therein.) The order of proof in such case is largely controlled by the trial judge; and where the crime has to be established by circumstantial evidence the prosecutor must be given permission to present that proof bit by bit as best he can without too rigid enforcement of the rule. If upon completion of the State's case, all the facts tend to show a conspiracy, the order of proof in which the acts of the conspirators are shown is not of much importance. (*State v. Shaw*, 108 Kan. 781, 196 Pac. 1100, and cases cited therein.)" (p. 411.) (Emphasis added.)

K. S. A. 60-460 (*i*) codifies in substance the exception to the hearsay rule as stated in *Borserine*. In *Borserine* this court accepted the view that a conspiracy is not terminated when an attempt to conceal the offense is made. The acts and declarations of one conspirator in the prosecution of the crime or its concealment in the foregoing respects are considered the acts and declarations of all, and are evidence against all. (Syl. ¶ 5.)

*Borserine* also stands for the proposition that evidence of a conspiracy involving several persons to commit the crime *for which one is separately charged* in an indictment or information is admissible to show a conspiracy between the one separately charged and the others, although the others are not joined in the indictment or information *and no conspiracy is charged therein.* (Syl. ¶ 2.) (See, also, *State v. Shaw*, 195 Kan. 677, 408 P. 2d 650.)

It is obvious from the record that Mefford's statement to witness Ron Thomas was an attempt to conceal the crime. As such, the conspiracy had not terminated and the statement was admissible as against the appellant.

Although the record is neither clear nor complete where it covers the testimony of Wylarma Phillips, wife of John Phillips, there exists small doubt that her testimony was admissible under

the theory that her testimony related to acts done to preserve the concealment of the offense.

Colonel Floyd Hannon of the Wichita police department testified that on February 14, 1969, the attorney for the co-conspirator, Ralph Cluck, informed Hannon that Cluck was willing to show Hannon where the body of Kenneth Ketter could be found. Colonel Hannon also testified regarding directions given to him by co-conspirator Cluck while they were searching for the body of the victim. The defendant assigns the admission of this testimony as error.

In light of the fact that Cluck testified in detail concerning the circumstances of the murder, including the statements he made to various law enforcement officers, this was harmless error.

The fact that the appellant was not charged with conspiracy is immaterial. (*State v. Borserine,* supra, Syl. ¶ 2.)

## VI.

The appellant contends the trial court erred in failing to sustain his motion for a mistrial at the end of the state's opening statement, and at the conclusion of the state's case in chief.

It is the appellant's position that the prosecuting attorney is in a quasi-judicial position and as an officer of the court must restrict his opening statement to the evidence he intends to present. While conceding that the prosecuting attorney must be given latitude in the opening statement, the appellant contends the opening statement here made was so prejudicial in its content that no instruction or reprimand from the court would correct the error committed. The appellant isolates various statements made by the prosecuting attorney in his opening statement concerning which there was no evidence introduced at the trial.

The county attorney in his opening statement addressed the jury for an hour and a half, and a reading of the entire opening statement in context indicates that the portions isolated by the appellant are relatively insignificant and could not have had a prejudicial effect upon the jury, nor did it deny the appellant a fair trial. Most of the statements made by the prosecuting attorney which were not borne out by the evidence concerned the details of various events. These details were trivial in nature and inconsequential.

Opening statements in a criminal prosecution are merely to advise the jury as to what it may expect by way of evidence and

the questions which will be presented to the jury, and they are not evidence but are merely for the assistance of the jury. (*Webb v. United States*, 191 F. 2d 512, 515 [10th Cir. 1951].)

Proof which the prosecuting attorney anticipates in the trial of a case frequently fails to come up to expectations, and so the tendency is to permit a prosecuting attorney a reasonable latitude in stating to the jury the facts he proposes to prove. Where no substantial prejudice results, and there is nothing to show that the prosecuting attorney acted in bad faith, appellate courts usually refuse to reverse or remand a case for a new trial because of a reference by the prosecuting attorney to matters which he subsequently made no attempt to prove, or for one reason or another was unable to prove. (*Woods v. State*, 440 P. 2d 994, 996 [Okl. Crim. 1968], cert. denied 393 U. S. 953; and *State. v. Sykes*, 372 S. W. 2d 24, 27 [Mo. 1963].)

Under the foregoing rule, disposition of an appellate claim on this point turns on the degree of prejudice resulting from the unsupported remarks of the prosecuting attorney.

The Kansas Supreme Court in *State v. Welsh*, 138 Kan. 379, 26 P. 2d 592, found that the county attorney was not guilty of misconduct in making certain remarks in his opening statement to the jury. There the trial court instructed the jury to confine its deliberations to the evidence, and absent bad faith, the harmful effect of an opening statement was considered cured.

In *Welsh* the prosecuting attorney in his opening statement referred to promises of material reward by the defendant to induce certain witnesses not to testify against him and had threatened, if he was arrested, to defeat the sheriff for reelection. In presenting the state's case the prosecuting attorney did not present evidence to prove these assertions made in his opening statement.

Even assuming some prejudice, which we do not concede, application of the *Welsh* rule to the facts in this case demonstrates that the prejudice was cured.

Two of the appellant's co-conspirators, Cluck and Mefford, on the record here presented implicated the appellant as a full and active participant in the crimes for which he was convicted. The court's instructions as a whole, and the county attorney's remarks at the conclusion of his opening statement, fully informed the jury that it was to confine its deliberations to the evidence.

## VII.

The appellant contends the trial court erred:

". . . in denying appellant's motion for discharge at the close of the State's case in chief in respect to counts # 1 and # 4 of the Information, for the reason count # 1 was the integral element of and merged in the crimes of kidnapping and murder and that the State's evidence failed to show that this defendant was in any way guilty of the charge contained in count # 4."

The appellant was charged in count # 1 with a felonious assault under K. S. A. 21-431. Count # 2 charged him with first degree kidnaping under K. S. A. 21-449. Count # 3 charged the appellant with felony murder under K. S. A. 21-401, and count # 4 charged him with first degree robbery under K. S. A. 21-527. The appellant argues he should have been discharged as to count # 1, felonious assault, because it was an integral element of the remaining three counts. His argument is based upon *State v. Gauger*, 200 Kan. 515, 438 P. 2d 455.

In *Gauger* the defendant without any provocation jumped up, hit the victim on the back of the head, knocked him to the ground, and, at knife point, rifled his pockets, took between $10 and $15 from him, and left the premises. The defendant there was charged with first degree robbery and assault with intent to rob. He was convicted of both crimes, but the Supreme Court on appeal reversed the conviction for assault. The language used by the court in announcing its decision reads:

"In the instant case there was but a single act of violence or intimidation, and that act, which was an essential element of the robbery conviction, was also relied on as constituting the separate crime of assault with intent to rob. Under such circumstances, we hold that two separate convictions cannot be carved out of the one act of criminal delinquency. . . ." (p. 525.)

The state argues that *Gauger* has no application to the facts here presented because there were a great many acts of violence. Here it is argued the beating of the victim with a pistol was separated by a great deal of time, space and violence from the actual taking of the victim's property. The state contends that immediately preceding the taking of the victim's property he was shot in the head and stabbed several times. This, it is argued, was more than adequate to establish the necessary element of violence for the robbery conviction.

With regard to the first count, felonious assault, the victim was beaten with a pistol, when he was first accosted in the alley behind his home, to the point of unconsciousness. He was then moved into

the Pontiac GTO which was used to transport him to the scene of the murder. Enroute his billfold was taken and the money divided. On these facts, it is our opinion that the rule in *Gauger* applies and count # 1 was duplicitous of count # 4 which charged the appellant with first degree robbery. We therefore hold the trial court should have dismissed count # 1 of the information at the close of the state's evidence.

As to count # 4 of the information, the appellant argues he did not participate in the taking of the victim's clothing, personal effects and money. He therefore asserts that the state did not prove a *prima facie* case as to count # 4. He argues the personal effects and Ketter's car keys were thrown in the water at the creek by Mefford; that Mefford ordered Phillips to take the clothes, which Phillips did; and that Cluck kept the loose change. As to Ketter's billfold, the appellant argues Phillips and Cluck divided the money and the appellant never had the billfold or any of the money.

On the facts in this case the appellant's conviction on count # 4 is supported by the evidence. Any person who counsels, aids or abets in the commission of any offense may be charged, tried and convicted in the same manner as if he were a principal. (K. S. A. 62-1016; *State v. Borserine,* supra; and *State v. Sharp,* 202 Kan. 644, 451 P. 2d 137.)

## VIII.

The appellant contends he was prejudiced and denied a fair trial because of the misconduct of the state in interviewing Dr. Kurth and Ralph Cluck in violation of the court's orders.

The appellant first asserts that the county attorney violated the physician-patient privilege. Dr. Kurth was the psychiatrist appointed by the court as a commission to examine the appellant as to his mental condition.

First, the appellant was not a "patient" within the meaning of K. S. A. 1971 Supp. 60-427 (*a*) (1). Second, the privilege does not exist in felony cases. (K. S. A. 1971 Supp. 60-427 [*b*].) Third, if the appellant be regarded as a patient, there is no privilege under K. S. A. 1971 Supp. 60-427 (*d*) (physician-patient privilege) in an action in which the condition of the patient is an element or factor of the claim or defense of the patient.

Dr. Kurth not only interviewed the appellant as the commissioner appointed by the court, but he also came to the jail and questioned the appellant concerning ownership of the gun that shot

the victim. In this the appellant contends Dr. Kurth was an agent of the state to gather information for the prosecution. Dr. Kurth did not testify at the trial concerning the statement made by the appellant, but it is argued the state used this evidence in preparing its case against him.

No evidence in the record is fingered by the appellant to support his position. Dr. Kurth did not testify at the trial of this case, and the appellant had no occasion to assert any privilege concerning which he complains. Error cannot be predicated upon such a nebulous and abstract assertion.

The appellant's contention concerning the county attorney's interview with Ralph Cluck in violation of the court's order also is frivolous.

During the cross-examination of the state's witness, Ralph Cluck, a recess was requested by Cluck's attorney, James Harrison, to discuss Cluck's testimony with him. Upon declaring a recess the trial court permitted Mr. Harrison to have a conference with his client. Shortly after this recess the trial court called the jury back and recessed for the day in order to hear several motions from the state. Thereafter, the county attorney and various law enforcement officers consulted with Cluck. The appellant argues the trial court ordered that no one talk to Cluck except his attorney. This was not the order of the trial court. It was only during the recess requested by Cluck's attorney that any inference could be drawn that no one was to talk to Cluck, except his attorney.

## IX.

The appellant has abandoned point nine in his brief wherein he challenged the trial court's admission of various state's exhibits into evidence.

## X.

The appellant contends the trial court erred in allowing endorsement by the state of Preston Haze and Chester Eugene Mefford on the information during the trial of the case, and in permitting Mefford to enter the courtroom during the time the appellant was testifying, and in permitting Mefford's recall as a rebuttal witness.

The appellant relies upon *Johnson v. Leggett*, 28 Kan. 590, for the proposition that the state could not impeach its own witness.

Two days after the offenses here under consideration were admitted, Mefford taped a statement for police officers. The state

sought admission of the taped statement by calling Mefford to the stand. For the most part Mefford refused to answer the county attorney's questions. The state then moved the trial court to admit the taped statement under K. S. A. 60-422 in order to show prior inconsistent statements, in an effort to impeach the witness. The trial court denied the motion. On appeal the appellant assigns this attempt to get the taped statement into evidence as error. We fail to see merit in this contention because the evidence offered to impeach Mefford was not admitted. The court sustained the appellant's objection at the trial level.

It should be noted at this point Mefford testified in full without reservation for the state in rebuttal, after he heard the testimony of the appellant on the witness stand.

Apparently Haze and Mefford were hostile to the state until they heard the testimony of the appellant. They then made it known to the county attorney they desired to testify on behalf of the state in rebuttal. Permitting the endorsement of their names on the information by the state during the trial under these circumstances was within the discretionary power of the trial court.

## XI.

The appellant contends the trial court did not correctly state the law of Kansas in giving instructions Nos. 7, 8, 11, 13 and 20 upon the facts and the evidence in this case.

## XII.

The appellant also contends the trial court erred in refusing to instruct the jury on lesser included offenses committed under duress.

Points eleven and twelve are argued by the appellant in his brief together. It is the appellant's contention that the trial court should have instructed the jury on lesser included offenses because the appellant committed the offenses with which he is here charged under duress exerted upon him by his co-conspirators, citing *State v. Reed,* 53 Kan. 767, 37 Pac. 174; and *State v. Davis,* 169 Kan. 251, 218 P. 2d 215.

The appellant asserts the jury should have been instructed on the reasonableness of the danger from Mefford to Campbell, and that it was a question of fact for the jury. The appellant contends there was sufficient proof in the record of Mefford exercising control over the other individuals, including the appellant.

The trial court denied the appellant's request for instructions on

lesser included offenses committed under duress on the ground that there was no evidence whatever to support such instructions.

Our review of the record confirms the trial court's finding in this respect, and the trial court did not err in refusing to instruct as requested.

## XIII.

The appellant asserts as his last point that the combined error of the various points previously asserted constitutes reversible error, in the event the appellate court does not find a single point of error sufficient to constitute reversible error.

Reviewing the record as a whole, none of the points asserted by the appellant for reversal, either in isolation or in combination, indicates that he was denied a fair trial or that his rights were substantially prejudiced to warrant the granting of a new trial. However, in view of the trial court's failure to dismiss count # 1 of the information at the close of the state's evidence, the conviction is reversed and the sentence vacated as to count # 1. The judgment and sentence on counts # 2, 3 and 4 are affirmed.