NOT DESIGNATED FOR PUBLICATION

No. 112,354

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MELVIN W. GRAY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed October 23, 2015. Affirmed.

*Reid T. Nelson*, of Capital and Conflicts Appeals Office, for appellant.

*Kerwin L. Spencer*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., BRUNS and SCHROEDER, JJ.

*Per Curiam*:  A jury convicted Melvin W. Gray of burglary, theft, and criminal damage to property. Gray challenges his convictions, claiming the trial court should have suppressed the witness identifications from photo arrays, and the prosecutor committed misconduct in opening statements by arguing facts he knew were not admissible at trial. Finding no reversible error, we affirm.

Karen Herrington lived a few miles outside of town in Wellington, Kansas. On August 15, 2012, she left her home with her two small boys at around 12:30 p.m. When

1

Herrington returned home at around 2:15 p.m., she saw a teal minivan parked in her driveway and a man standing at her front door.

As she got out of her car, the man got into the van and began backing out of the driveway. Herrington thought it was odd but asked him if he needed any help. The man answered, but Herrington could not hear his voice over the sound of the wind. She approached the driver's window of the van so she could better hear him. The man asked if "this was the Bauer's residence?" Herrington told the man she did not know anyone by that name, so the man left.

Herrington testified she was "just a couple of steps away" from the man when they were talking. She consistently described the man as a white male, 6'2"- 6'4" tall, with curly light brown hair and a receding hairline. Herrington also noticed a circle shaped tattoo on the left of the man's neck. Her focus was on the man, so she did not look into the van. She thought the van had Reno County tags, but was not sure.

When Herrington got to her front door, she noticed the door frame was splintered and the door was open. Herrington testified she immediately knew someone had broken into her home and it was obvious she had interrupted something. Fearful someone might still be in her home, she took her boys back to the car. Herrington saw the teal minivan driving away from her home at a fast speed. She called her brother and 911.

Deputy Jerry Blunk was the first officer to respond to Herrington's home. Herrington gave Deputy Blunk a description of the vehicle and the man. Deputy Blunk walked through the home with Herrington to determine what had been disturbed. Herrington determined her TV, wedding ring, and anniversary ring were missing. The house had been ransacked. A shotgun kept under the bed was out, a clothes hamper had been dumped and filled with various valuables, and drawers were opened. The front door and door frame had been damaged by a forced entry.

2

Detective Keith Bristor also responded to Herrington's home. He processed the scene for fingerprints but was unable to obtain any usable prints. Deputy Risa Stegman also responded to Herrington's home. Deputy Stegman patrolled the area looking for the teal minivan. After the area search was unsuccessful, Deputy Stegman returned to Herrington's home to photograph the scene.

Captain Jeff Hawkins also arrived on the scene. Captain Hawkins attempted to locate the vehicle, following the general direction Herrington had reported seeing it flee.

On August 16, 2012, Ted Rieckenberg was building a terrace in a field near the I-70 turnpike service area. In the early morning, he noticed a teal minivan parked by some trees, as if "somebody [was] trying to hide it." A little later, Rieckenberg saw a small white car drive up on the road where he was working on a bulldozer. A woman was in the driver's seat. A man got out and raised the hood as if he was checking the motor. Rieckenberg asked if they needed help and they indicated they did not.

Rieckenberg then saw the van driving away from the trees. Rieckenberg yelled at the driver, who stopped. Rieckenberg approached the passenger side of the vehicle and asked the driver what he was doing. The driver indicated he was looking for turkeys. Rieckenberg knew it was not turkey season. He also saw a black tarp in the back of the van. Rieckenberg told the man he was trespassing and that he needed to leave and not return.

Rieckenberg wrote down the tag number as the van drove away. He also saw the rear passenger tire was nearly flat. Rieckenberg tried to call 911 but could not get cell service. When he went home for lunch, he called Belle Plaine Police Chief Gordon Fell.

3

Chief Fell testified he received Rieckenberg's call around 11 a.m. The plate number Rieckenberg gave Chief Fell was P-D-J-4-9 and the last digit was possibly a six. Chief Fell thought this vehicle matched the description of the van associated with the burglary of Herrington's home. Chief Fell contacted Detective Hawkins and Deputy Stegman to report what Rieckenberg had seen.

Chief Fell proceeded to the area where Rieckenberg reported seeing the van. He found a shredded tire and a van matching the description near the area. The van had been abandoned and its rear passenger tire was flat. The tag was Barton County P-D-J-4-9-6. The tags did not match the van's vehicle identification number. Deputy Stegman also responded to the vehicle. Chief Fell left to try to trace the path the van had likely taken.

Deputy Stegman contacted Herrington and asked if she would look at a picture of the van to see if she could identify it. Herrington recognized the van as the one that had been at her house the previous day.

Captain Hawkins also learned of the abandoned van and reported to that scene. He contacted Rieckenberg and learned about the small white vehicle Rieckenberg had seen. Rieckenberg told Captain Hawkins the white vehicle had some sort of design in back along the lower part of the doors.

Captain Hawkins and other officers attempted to locate the driver of the van based on Rieckenberg's description. Captain Hawkins went to the turnpike rest stop and learned that an employee had allowed a man matching the description to use his phone and a short time later someone picked the man up. The employee allowed Chief Fell to look at the cell phone to gather the number the man had called. The number tracked back to 1748 S. Waco in Wichita, Kansas. Captain Hawkins went to that address and spoke with a man named William Kirks. Kirks was in his early 50's and appeared to have serious health problems. Kirks told Captain Hawkins he had received a call and had picked someone up

4

at the rest stop. Kirks identified the individual as "Rusty"—aka Melvin Gray. Kirks told Captain Hawkins he dropped Gray off at another residence. At the second address, Captain Hawkins saw a small white car with black graphics along the bottom edge of the car on each side below the doors. He reported what he learned to Detective Bristor.

On August 17, 2012, after speaking with Captain Hawkins, Detective Bristor obtained a photograph of Gray. Detective Bristor compiled this photograph with five other photographs and presented them to the witnesses.

Detective Bristor took the lineup photos to Herrington. She flipped through the photos and identified Gray as the man who had been at her house on August 15, 2012. Herrington testified she "recognized him right away." She signed a form indicating her results from the lineup.

On August 20, 2012, Detective Bristor took the lineup photos to Rieckenberg who identified the photo of the van as the one he had seen in the field. He also identified Gray as the man he had seen trespassing in the field.

The State charged Gray with burglary of a dwelling, theft, and criminal damage to property.

On January 15, 2014, Gray filed a motion to suppress the photo array identification. He contended Herrington's and Rieckenberg's identifications should be suppressed because they were not reliable. Gray claimed the photo array included individuals who were not of the same stature, build, weight, or facial appearance as him "thus making it highly suggestive." Gray also challenged the method officers used— showing one picture at a time—for the lineup.

On February 12, 2014, the trial court issued its journal entry denying Gray's motion to suppress. The court determined the photo array "fit the overall description given by the witnesses and [was] not presented in a leading or suggestive manor." The court noted that "both witnesses were definite in their identification of [Gray]."

During opening statements at trial, the prosecutor made the following prediction of what the evidence would show:

> "Officers searched the area which is near the Belle Plaine service area. And they went and talked to a clerk at the convenience store. Located a phone number from a loaned phone. Went to Wichita in response to that and ended up at an address at 1748 South Waco in Wichita. And Captain Jeff Hawkins went there, talked to a person. They had a conversation about a Rusty. And then, as a result of that, the detectives then contacted Great Bend and obtained a . . . photograph of Melvin Gray, also known as Rusty."

Defense counsel did not object to this statement.

Herrington again identified Gray as the man who was at her home on August 15, 2012. Rieckenberg also identified Gray as the man he saw driving the van in the field on August 16, 2012. The prosecutor wanted Captain Hawkins to discuss how he got Gray's photo from the Great Bend police. The prosecutor began asking him about how officers had gone to the turnpike rest stop and found the employee who had let Gray use his phone, and then about how he had gone to the Wichita address associated with the phone number. However, defense counsel objected:

> "[Prosecutor to witness]: And did you receive another address to go and investigate in reference to this situation?
> "[Defense counsel]: I think that would now call for hearsay, Your Honor. I don't believe this gentleman is under subpoena.
> "[Prosecutor]: Oh, he is under subpoena, but he hasn't been found to serve the subpoena.

6

"[Defense counsel]: Then he's not under subpoena.

"Court: Sustained."

Captain Hawkins then testified that he had seen the white car in the area. The prosecutor asked:

"[Prosecutor]: And then did you go then to attempt to see if Melvin Gray was there?

"[Hawkins]: Not on that day, no.

"[Prosecutor]: Did you go back there at any time?

"THE COURT: Counsel, approach the bench.

(An off-the-record discussion was had by court and counsel at the bench out of the hearing of the jury.)

"THE COURT: Disregard the last question by [the prosecutor] referencing the name of the defendant."

Defense counsel also objected when the State offered the photo array, Herrington's signed identification, and Rieckenberg's signed identification.

The jury convicted Gray on all three counts.

On March 18, 2014, Gray filed a motion for directed judgment of acquittal under K.S.A. 22-3419. Without elaboration, Gray argued that "the verdict was contrary to the evidence presented" and "there was reasonable doubt within which to acquit" him.

On March 19, 2014, Gray filed a motion for mistrial under K.S.A. 22-3423. He argued a mistrial was warranted based on prosecutorial misconduct committed during opening statements. Gray argued the prosecutor committed misconduct by telling the jury the State would present evidence from a witness who lived at a Wichita address called from the turnpike employee's cell phone even though the State knew it had been unable to

serve a subpoena on that witness. Gray argued the prosecutor's actions "had to be intentional, thus depriving [him] of a fair trial."

On April 9, 2014, Gray filed a pro se amended motion for mistrial. Gray argued that during opening statements, the prosecutor had misled the jury into thinking Gray had been charged with criminal trespass. Gray argued nobody could say what the verdict might have been, if the jury had not heard criminal trespass as part of the charges.

The trial court denied Gray's motions.

On April 10, 2014, the trial court sentenced Gray to the aggravated sentence for each charge. The sentences were to run concurrent to each other. Based on his criminal history and the severity of the charges, Gray received a controlling 23-month sentence. He was ordered to pay Herrington $2,691.05 in restitution.

Gray appeals his convictions, arguing that the trial court should have suppressed the photo array and witness identifications obtained through use of the array; and the prosecutor committed reversible misconduct by arguing facts not in evidence in its opening statement.

Gray contends the trial court erred when it failed to suppress the photo array, Herrington's identification, and Rieckenberg's identification. Gray preserved this issue by contemporaneously objecting to the admission of the array and witness identifications at trial.

Appellate courts review challenges to eyewitness identifications under a bifurcated standard. *State v. Cruz*, 297 Kan. 1048, 1058-59, 307 P.3d 199 (2013); *State v. Cox*, No. 109,986, 2014 WL 4916517, at *2 (Kan. App. 2014) (unpublished opinion). An appellate court must first determine if the trial court's factual findings are supported by substantial

competent evidence. Then, the ultimate legal conclusion is reviewed with no deference to the trial court. 297 Kan. at 1058-59.

In *Cruz*, the Kansas Supreme Court described the process trial courts must follow when determining whether to admit and eyewitness identification:

> "'The first step examines whether the police procedure used to obtain the identification was . . . unnecessarily suggestive. If so, trial courts move to the second step and consider whether there was a substantial likelihood of misidentification under the totality of the circumstances surrounding it.' *State v. Mitchell*, 294 Kan. 469, 476, 275 P.3d 905 (2012) (citing *Corbett*, 281 Kan. at 304 [130 P.3d 1179])." *Cruz*, 297 Kan. at 1059.

But even if the police use an unnecessarily suggestive procedure, suppression of the identification is not mandatory. 297 Kan. at 1064 (citing *Perry v. New Hampshire*, 132 S. Ct. 716, 724, 181 L. Ed 2d 694 (2012). The critical element is, whether under the circumstances, the identification is reliable. 297 Kan. at 1064. Courts should consider, "the witness' opportunity to view the criminal during the incident, the accuracy of the witness' first description, the time elapsed between the incident and the later identification, and the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly. [Citations omitted.]" 297 Kan. at 1064 (parading defendant by himself in front of victim after officers told victim officers had stopped a vehicle whose occupants might be involved in crime that was unnecessarily suggestive; affirmed on reliability nonetheless).

Gray filed a motion to suppress the photo array alleging it was highly suggestive. On February 6, 2014, the trial court held a hearing on Gray's motion. Detective Bristor, Rieckenberg, and Herrington testified. Detective Bristor testified he chose the five photos to include with Gray's photo for the array. He chose the photos based on the witnesses' descriptions. Rieckenberg described the individual driving the teal van as a white male, mid-30's, early 40's, with tattoos on both arms. Herrington described the individual

9

driving the teal van as a white male, tall, slender, short curly light brown hair, and a receding hair line.

Detective Bristor gave both witnesses the following written admonition to read to themselves before he presented the photo array:

"You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not under any obligations to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Do not be influenced by the fact that some of the pictures may be in color while others are black and white. Please do not discuss this case with other witnesses nor indicate in any way that you have or have not identified someone."

Both witnesses signed the admonition.

Detective Bristor put Gray's photo into the middle of the stack of photos before presenting them to Rieckenberg and Herrington. In support of his challenge to the admission of the photo array identifications, defense counsel attempted to highlight differences between the facial hair and body size of the individuals in the photographs.

Rieckenberg testified he was very close to Gray when they spoke. He was leaning in the passenger window of the van while Gray was driving it. Detective Bristor had asked him to view the photo line-up 4 or 5 days after the encounter. Rieckenberg had looked at the photos one at a time and had identified Gray as the man he had seen driving the van.

Herrington testified she was "a couple of steps away" from the driver of the van when she spoke to him. She indicated Detective Bristor had given her the packet of

pictures and she looked through them one at a time. She testified she "picked [Gray] out right away. . . . there was no doubt in my mind."

Defense counsel made a closing argument that the photos were so dissimilar as to be "highly suggestive." Defense counsel argued the photos should have been spread out and shown to the witnesses all at once.

The trial court denied Gray's motion and found that the five other photos in the array were all within the descriptions given by witnesses. The court noted that Gray's neck tattoo was not the most predominant of tattoos shown in the photos. The court found the photos were the same size and the officer had done an excellent job selecting photos and presenting the photos to the witnesses "so as not to be leading and suggestive." The officer had provided the witnesses with disclosures before presenting the pictures. And the "witnesses both picked out [Gray] immediately. . . . I think it was a fair packet. It wasn't leading, suggestive."

An appellate court must determine whether the trial court's factual findings are supported by substantial competent evidence. Considering the facts laid out above, the record reveals the trial court's findings were supported by substantial competent evidence. Both witnesses were in close proximity to Gray when they saw him and were shown the line-up shortly after first seeing him. Detective Bristor, Rieckenberg, and Herrington's testimony all indicate Detective Bristor presented the photos in a manner that was not unnecessarily suggestive. The photo array itself indicates the photos all fit the descriptions the witnesses had provided to Detective Bristor. Because the array was not unnecessarily suggestive, we need not determine whether there was a substantial likelihood of misidentification under the circumstances. See *Cruz*, 297 Kan. at 1059.

An appellate court must review the legal conclusion—here, whether or not the photo array identifications should be suppressed—with no deference to the trial court.

11

The array itself and Detective Bristor's presentation of it was not unnecessarily suggestive and the witnesses' identifications were reliable. Gray's contentions, including that Herrington used different words to describe light brown hair—light brown, sandy-colored, and light in color—are unpersuasive. Therefore, there was no reason not to allow the jury to consider the witness identifications.

Next, Gray argues the prosecutor committed reversible misconduct during opening statements when he referred to evidence he should have known would not be admissible.

An appellate court will review a claim of prosecutorial misconduct based on comments made during opening statements even when a contemporaneous objection was not made at trial. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012).

"The opening statement is given for the purposes of assisting the jury in understanding what each side expects its evidence at trial will prove and to advise the jury what questions will be presented for its decision. The tendency is to permit a prosecutor reasonable latitude in stating to the jury the facts he or she proposes to prove." *State v. Fielden*, 42 Kan. App. 2d 710, 716, 217 P.3d 986 (2007).

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. First, the court determines whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. If misconduct is found, the appellate court must determine whether the improper comments compel reversal; that is, whether the statements prejudiced the jury against the defendant and denied him a fair trial. *State v. Armstrong*, 299 Kan. 405, 416, 324 P.3d 1052 (2014.)

In the second step, an appellate court considers three factors: (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the

prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014). None of these factors is controlling. 299 Kan. at 540-41.

A prosecutor is precluded from commenting on facts not in evidence. *State v. Smith*, 296 Kan. 111, 133-34, 293 P.3d 669 (2012).

On appeal, Gray argues the prosecutor stepped outside his wide latitude during opening statements. Gray challenges the following statement made by the prosecutor in his opening statement:

> "Officers searched the area which is near the Belle Plaine service area. And they went and talked to a clerk at the convenience store. Located a phone number from a loaned phone. Went to Wichita in response to that and ended up at an address at 1748 South Waco in Wichita. And Captain Jeff Captain Hawkins went there, talked to [William Kirks]. They had a conversation about a Rusty. And then, as a result of that, the detectives then contacted Great Bend and obtained a . . . photograph of Melvin Gray, also known as Rusty."

Gray suggests the prosecutor was trying to establish that the driver of the teal van used a phone at the rest stop. When officers contacted that phone number, Kirks identified the person who had called him as Rusty also known as Melvin Gray.

Gray argues the prosecutor's ill will is demonstrated because the prosecutor should have known the testimony of the substance of the conversation between Captain Hawkins and Kirks was inadmissible hearsay for the following reasons: (1) Kirks could not be located or served with a subpoena as of the trial; (2) the trial court sustained Gray's hearsay objection at trial when the prosecutor asked Captain Hawkins if he had received another address from Kirks; and (3) at the preliminary hearing the prosecutor asked

13

Captain Hawkins about the rest stop phone call: "And this person had . . . let this man use their cell phone to make a call for someone to come pick him up." After Gray objected, the prosecutor stated he was just trying to explain the officer's actions and how he obtained Gray's photo. The trial court sustained the objection.

Though Gray did not object to the statement during opening statement, he filed a motion for a mistrial after trial claiming the same misconduct he claims on appeal. On April 10, 2014, the trial court held a hearing to consider posttrial motions. Both parties made arguments. Regarding Gray's motion for mistrial, the trial court held:

> "[W]hat we have is a situation where the State gave an opening. We got into the facts that were not admitted at trial because the court disagreed with the prosecutor's theory regarding hearsay, and the court disallowed the testimony. Because the State misunderstood or misconstrued what they could get in within the rules of hearsay, I don't think there's ill will by the prosecution in this matter. I just think it was a miscalculation."

The trial court denied Gray's motion for a mistrial. The court did not make a specific finding as to whether the statement was outside the wide latitude afforded a prosecutor but did determine there was no ill will. Gray does not challenge the court's denial of his motion for mistrial. Gray only alleges the statement during opening was reversible prosecutorial misconduct.

On appeal, the State responds that there is no need to "get to the analysis of whether the prosecutor showed 'ill will' . . . because it is clear under *Barney* that the evidence was properly admissible to show why [Gray's] photo was obtained." The State contends that even if we did consider ill will, there is no evidence to support a finding of ill will. The State also suggests the prosecutor merely miscalculated what evidence would be admissible to establish why and how the officers obtained Gray's photograph.

14

The State argues Kansas appellate cases have held that it is not hearsay to explain why an officer took specific action. Hearsay is evidence of "a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2014 Supp. 60-460. "'Testimony is not inadmissible as hearsay evidence when it is not offered to prove the truth of the matter asserted.' *State v. Crowley*, 220 Kan. 532, 536-37, 552 P.2d 971 (1976)." *State v. Barney*, 39 Kan. App. 2d 540, 545, 185 P.3d 277 (2007), *rev. denied* 286 Kan. 1180 (2008).

In *Barney*, this court recognized instances in which the substance of an anonymous call was admissible to explain an officer's actions. 39 Kan. App. 2d at 547 (officer's testimony regarding police dispatch statement providing a description of a man who was acting suspiciously not inadmissible hearsay when not offered to prove the truth of the matter asserted). See *State v. Laubach*, 220 Kan. 679, 556 P.2d 405 (1976) (Police dispatch sent a description of a robber to various motels. Based on the description, a motel employee reported the suspect was attempting to check into that motel. Defendant objected to an investigating officer's testimony about the description of the suspect he received from another officer. Testimony was admissible to explain the officer's actions in the investigation of the crime.); *State v. Hollaway*, 214 Kan. 636, 522 P.2d 364 (1974) (testimony regarding a dispatch call providing a description of a suspect's vehicle admissible to provide an explanation of an officer's actions.)

However, the *Barney* court recognized the "limits to the admissibility of hearsay statements in this context." 39 Kan. App. 2d at 546-47. The *Barney* court cited cases that found the substance of anonymous calls to police officers inadmissible hearsay when "it tended to identify the accused and establish his guilt." 39 Kan. App. 2d at 546-47. See *State v. Jamison*, 269 Kan. 564, 570, 7 P.3d 1204 (2000) (substance of anonymous call inadmissible when it included "'that the shooter, E-Bud, had dark skin and walks with a limp.'" Because the call identified the shooter by his gang name, the call could not be admitted); *State v. Thompson*, 221 Kan. 176, 179, 558 P.2d 93 (1976) (substance of

15

anonymous call inadmissible when it advised police the crime being investigated had been committed by "Crazy John.")

Here, Kirks was not an anonymous caller. However, he was not under subpoena and did not testify. Kirks had identified Gray as the individual who had called him from the turnpike and the individual he had picked up from the turnpike rest stop. But Kirks did not identify Gray as the individual who had robbed Herrington or driven the teal minivan from the tree line in the field. Therefore, this case presented the prosecutor with facts that fell in the grey area between admissible testimony and inadmissible hearsay. And the prosecutor could have thought he would be able to have Captain Hawkins testify about the substance of his conversation with Kirks only to establish Captain Hawkins' course of investigation.

"Reversing a conviction because of . . . prosecutorial misconduct requires a finding of prejudice to the defendant." *State v. Breedlove*, 295 Kan. 481, 495, 286 P.3d 1123 (2012). As often occurs in trial, the proof a party anticipates does not always materialize. See *State v. Campbell*, 210 Kan. 265, Syl. ¶ 9, 500 P.2d 21 (1972).

> "When the prosecution announces in opening statements that a certain witness will testify about highly incriminating evidence and this evidence is later excluded, no manifest injustice occurs requiring mistrial. *State v. Ruebke*, 240 Kan. 493, 503, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987); see also *Wilkerson v. State*, 874 S.W.2d 127, 131 (Tex. App.1994) (preliminary statement of what State expects to prove is proper, even if State does not introduce any supporting evidence); *Travieso v. State*, 480 So. 2d 100, 103 (Fla. App. 1985) (preliminary statement by State indicating witness' testimony proper even if witness later is not called)." *In re Minnis*, 29 Kan. App. 2d 644, 647, 29 P.3d 462 (2001).

In *Ruebke*, the Kansas Supreme Court held there was no evidence to suggest the prosecutor was acting in bad faith during opening statements because,

16

> "[t]he prosecutor proffered the testimony to show Ruebke's state of mind. The witness was present and ready to testify at trial. She had been subpoenaed to testify on two prior occasions. The defendant's attorney had the investigative report concerning her statements. The defense attorney knew that the witness was going to be called at trial, but did not seek to suppress her testimony until after the State's opening statement." 240 Kan. at 504.

However, Ruebke later filed a motion in limine to suppress the witness' testimony, which the court granted. Because the prosecutor had reason to believe the testimony would be presented, there was no evidence of bad faith when the prosecutor made the statement in opening. 240 Kan. at 503-04.

Here, the prosecutor had case law suggesting Captain Hawkins could testify to the substance of his conversation with Kirks to establish Captain Hawkins' actions. Even if we would determine the prosecutor had stepped outside the wide latitude afforded him and hold that the prosecutor should have anticipated Captain Hawkins testimony would not be admissible because he knew the subpoena for Kirks had not been served, it is only reversible upon a showing of prejudice.

To determine whether the prosecutor's conduct was gross and flagrant, we must consider whether the prosecutor's comment was repeated, emphasized, and improper, and whether it was planned or calculated, or was contrary to a longstanding rule of law. *State v. Kno*, 301 Kan. 671, 685, 347 P.3d 656 (2015). Here, the prosecutor's miscalculation of evidence was not contrary to well established law; instead, the facts of this case appear to fall in the grey area of what is admissible testimony and what is inadmissible hearsay.

Next, we must determine whether the prosecutor's statement was motivated by ill will, consider whether the statement was made in apparent indifference to a court's ruling, or was repeated and deliberate. *Knox*, 301 Kan. at 685. Gray did not object to the

17

prosecutor's opening statement, so it cannot be said that the statement was made with indifference to the court's ruling.

Finally, we will consider whether the State has satisfied its burden of proving beyond a reasonable doubt that the prosecutor's statement did not affect the outcome of the trial in light of the entire record, *i.e.*, that there was no reasonable possibility that the error contributed to the verdict. *Knox*, 301 Kan. at 685. As part of this determination, we must consider whether the prosecutor's statements misled the jury. See *State v. Huddleston*, 298 Kan. 941, 947-48, 318 P.3d 140 (2014.) The State argues any prejudice to Gray was minimal since the jury had been instructed to disregard statements made by the attorneys that were not supported by the evidence. Further, the State argues the evidence against Gray, including the eyewitness testimony that was so strong that there was little, if any likelihood that the prosecutor's remarks in the opening statement changed the outcome of the trial. Here, because of the nature of the evidence against Gray, especially Herrington and Rieckenberg's identifications of him, the prosecutor's comment likely had little weight in the mind of the jurors and likely did not affect the outcome of Gray's trial.

Even if the prosecutor's statement was improper it did not rise to the level of misconduct, the prosecutor's conduct was not gross and flagrant and did not show ill will towards Gray. Under these circumstances, the prosecutor's comment did not amount to reversible error.

Affirmed.