No. 44,749

STATE OF KANSAS, *Appellee,* v. ROBERT A. GAUGER, JR., *Appellant.*

(438 P. 2d 455)

Opinion filed March 9, 1968.

*William R. Brady*, of Topeka, argued the cause, and was on the brief for the appellant.

*James W. Snyder, Jr.*, assistant county attorney, argued the cause, and *Robert C. Londerholm*, attorney general, and *Joseph J. Dawes, Jr.*, county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

O'CONNOR, J.: The defendant, Robert A. Gauger, Jr., was convicted by a jury of first degree robbery (K. S. A. 21-527) and assault with intent to rob (K. S. A. 21-431). His motion for new trial was overruled, and he was sentenced to the state reformatory on each charge, the sentences to run concurrently. He now appeals.

Two points are raised: (1) the propriety of the county attorney's closing argument to the jury, and (2) whether or not, under the evidence, two separate, distinct offenses were committed.

On September 25, 1965, Virgil Ballard, the victim, who resides at the domiciliary barracks at Wadsworth VA Hospital, went to the boarding home of defendant's uncle, Bill Gauger, about 9:00 a. m. Ballard spent most of the day, in company with several other men, drinking wine while sitting and talking around a wooden table in the yard. During this time the defendant and one Frazer Garrett were cleaning out a clogged sewer line located about twenty or thirty feet from where the men were sitting. Sometime after noon, according to Ballard's testimony, the defendant joined the men around the table. After drinking with them for a period of about three hours, the defendant, without any provocation, jumped up, hit Ballard on the back of the head, knocked him to the ground, and, at knife point, rifled his pockets, took between ten and fifteen dollars from him, and left the premises. As Ballard fell he struck at the knife and cut his right hand.

After the assault Ballard went across the street to a friend's house, where he and his friend continued to drink until early the following morning. About 4:00 a. m. Ballard returned to Wadsworth and sought treatment for his wounded hand from Dr. Thomas G. McCullough. Later in the day Ballard reported the incident to a guard at the hospital. In turn, the guard called the Leavenworth police, and thereafter charges were filed against the defendant.

Ballard's account about seeking treatment for his hand was supported by the testimony of the doctor, and the hospital guard substantiated Ballard's testimony about reporting the incident.

In his defense the defendant denied he hit Ballard or took any

money out of his pockets, denied he sat at the table and drank with the men, and claimed it was several days after September 25 he first learned he was accused of robbing and assaulting Ballard. Defendant's version of the incident was that as Ballard was getting up from the table about 1:00 or 1:30 p. m. he rocked back and forth and fell forwards; that Ballard tried to catch himself on the table, his right hand hit the edge of the table, and he fell to the ground; that two of the men who were sitting at the table picked Ballard up and set him in a chair. Defendant went over to the table to pick up some of the empty wine bottles, and it was then he noticed some blood on the table and Ballard's cut hand. Defendant described the table as being wooden, with a steel or aluminum edging, and nails sticking up from the top. After noticing Ballard's bleeding hand, defendant obtained a rag and gave it to Garrett, who wrapped Ballard's hand. Ballard was then taken by Pat Finch, one of the men seated at the table, to Finch's house across the street.

Defendant's testimony was supported by that given by Garrett and George Nason, one of the men who had spent the day drinking with Ballard. Both Garrett and Nason testified they gave statements to the police concerning the incident at Bill Gauger's place. On cross-examination Garrett admitted portions of his testimony (some of which are not material to the point raised) were probably contrary to those in his statement to the police, and Nason said he could not remember what he told the police.

On direct examination Garrett testified that he helped the defendant work on a sewer line, that defendant worked at the job from 9:00 a. m. to 3:30 in the afternoon, and that at no time during the day did he see the defendant strike Ballard or have a knife and threaten him. Garrett was cross-examined as follows:

"Q. . . . Why didn't you tell the police that that was the type of work you were doing when you gave them that statement, this digging?

"A. I thought I mentioned it in there.

"Q. Isn't it true the only thing you mentioned in this statement you gave them was you were mopping the floors inside the house and you didn't see a thing?

"A. Well, I didn't see anything out there going on.

"Q. No, you didn't did you?

"A. I saw some men out there; I told them that.

. . . . . . . . . . . . . .

"Q. Is it not true that you gave this statement to the police on the 29th of September, 1965?

"A. I sure did.

"Q. That after you got through mopping the floors in the morning, the morning of the 25th—

"A. Yes, sir.

"Q. [Reading from defendant's written statement to the police] '—I went outside to hang up the mop—'

"A. Yes, sir.

"Q. '. . . No, I did not see Bobby Gauger strike Mr. Ballard. Yes, something could have happened out there while I was in the other rooms of the house mopping the floors, but I doubt it. Yes, Mr. Ballard could have gotten cut by a knife and I wouldn't have known anything about it.' Is this not the statement you gave the police?

"A. It is possible I didn't know anything about it."

Similarly, Nason testified that defendant did not strike Ballard or threaten him with a knife, and on cross-examination he said he saw Garrett and the defendant working on the sewer line most of the day. In response to further questions by the county attorney, Nason said he told the police what had happened, and was interrogated as follows:

"Q. Is it true that your statement [to the police] stated that, 'Bobby Gauger was nowhere around the table. No, I never even saw him in the yard.' You told that to the police, didn't you?

"A. *I don't know.*

"Q. You don't know?

"A. No, I don't.

"Q. Will it do you any good to take a while and try to remember what you told them?

"A. *I don't know what I told them.*" (Emphasis added.)

No objection was interposed by defendant's counsel to the cross-examination of the witnesses by the county attorney. It is further noted the state made no effort to introduce into evidence the prior statements of either Garrett or Nason, nor did any witness testify what Garrett and Nason told the police.

Against this backdrop is defendant's assertion that the trial court erroneously permitted the county attorney in his closing argument to comment on and read from the prior statements of Garrett and Nason.

The pertinent parts of the county attorney's closing argument are:

". . . Among these statements were statements given by the witnesses for the defendant, Frazer Garrett and George Nason. You heard their testimony today, and you have heard their statements that were given immediately, or very shortly after this occurrence.

"Mr. Brady: Your Honor, I don't believe there was any evidence of any statements that were given.

"Mr. Chapman: Your Honor, first, Garrett admitted making the statement, and the second one thought he did or didn't remember.

"Mr. Brady: The jury didn't hear the statement.

"Mr. Chapman: I read it to them, Your Honor.

"The Court: I will overrule the objection. Go ahead.

.   .   .   .   .   .   .   .   .   .   .   .

"[Mr. Chapman:]   .   .   .   Nason told you on the stand that he saw Bobby Gauger that whole day doing nothing but work on that trench; he didn't do anything but work on that trench, and you recall that we bore down on this to find out just what he did say he saw. He saw him doing nothing but working on that trench. His statement to the police was that Bobby Gauger was nowhere around. 'I never even saw him in the yard.' He is the same man that went through all this, then, this morning saying that he saw him do nothing but dig in that trench.

"[Garrett] stated that he was working on that trench, again all day, all morning and all afternoon,   .   .   .   whereas his statement is given two or three days later that he was mopping, that he was mopping the floor and that something could have happened out there, but he just didn't see it.   .   .   . His statement is that 'it could have happened out there while I was in the other rooms of the house mopping the floors, but I doubt it. Ballard could have been cut by a knife, but I wouldn't know anything about it.' That is his statement."

In his closing argument, defendant's counsel, in referring to the comments of the county attorney, said:

".   .   .   I certainly haven't heard any statements introduced in evidence, or heard any police officer testify from that witness stand about any statements that he took from Mr. Garrett or any of the other people that were around that table. Again, the county attorney here is using innuendoes. He was holding something in his hand, and he is trying to get across to you that this was some kind of statement that he had.   .   .   .   There is nothing in evidence here in this court of any statements."

In rebuttal, the county attorney referred to Garrett's testimony that he admitted making the prior statement and commented, "This is evidence."

The record does not disclose that either witness was ever given an opportunity to look at or identify the written statement allegedly given by him to the police. The contents of the purported statements were revealed only in the form of questions read by the county attorney in cross-examining the witnesses.

The import of Garrett's testimony is that he admitted his testimony at trial did not correspond with his prior statement concerning his whereabouts at the time of the incident. His explanation for any discrepancy was that his statement to the police was not "all-inclusive" and that he answered only the questions asked of

him. By Garrett in effect admitting that he made the portions of the statement read to him, and that it was perhaps inconsistent with his testimony, there was no necessity to introduce the statement itself for impeachment purposes. (*Lewis v. State,* 4 Kan. 296; Gard, Kansas Code of Civil Procedure § 422.) Therefore, the county attorney's argument relative to Garrett's testimony was within permissible bounds.

The objection to the argument concerning the inconsistency of Nason's prior statement is more serious, for he did not admit the specific inconsistency. In fact, Nason testified he didn't remember what he had told the police. After Nason's so testifying, it was incumbent on the county attorney to introduce the prior statement into evidence or produce evidence of its contents if he wished to pursue the matter in his closing argument to the jury. Where the impeaching statement is written, and the witness, although admitting that he gave a statement, cannot remember the contents thereof, or will neither admit nor deny the same, there is ample foundation for admitting the statement itself or at least the impeaching portion thereof into evidence. (*Hancock v. Bevins,* 135 Kan. 195, 9 P. 2d 634; *Lewis v. State,* supra; Gard, Kansas Code of Civil Procedure § 422; 4 Jones on Evidence [5th Ed.] §§ 935, 937; 3 Wigmore on Evidence [3d Ed.] § 1040.) It is well settled that prior inconsistent statements made by a witness out of court may be shown to impair his credibility. (*State v. Donahue,* 197 Kan. 317, 416 P. 2d 287; *McGrath v. Mance,* 194 Kan. 640, 400 P. 2d 1013.) It follows that Nason's prior statement to the effect that he never saw the defendant anywhere in the yard on the day in question did not become a part of the evidence, and the county attorney's argument relating to any purported inconsistency was clearly beyond the range of the evidence.

It is the duty of a county attorney in a criminal prosecution to see that the state's case is properly presented with earnestness and vigor, and to use every legitimate means to bring about a just conviction; but he should always keep in mind that he is an officer of the court. While he may indulge in oratory or may use picturesque language, as long as he introduces no facts not disclosed by the evidence, his liberty of argument must not degenerate into license to the extent the defendant's right to a fair trial is prejudiced. The primary purpose of argument by counsel is to enlighten the jury so that it may render a correct verdict. Although counsel is allowed

considerable latitude in discussing the evidence and drawing reasonable inferences therefrom, he may not introduce or comment on facts clearly outside the evidence. (*State v. Majors,* 182 Kan. 644, 323 P. 2d 917; *State v. Lopez,* 182 Kan. 46, 318 P. 2d 662; 53 Am. Jur., Trial § 463; 88 C. J. S., Trial § 169.) Counsel may comment on the credibility of a witness where his remarks are based on facts appearing in the evidence; but it is highly improper for the court to permit counsel to read or even refer to the contents of written matter not in evidence for the purpose of impeachment. (*Wilson v. Little,* 293 S. W. 2d 715 [Ky. 1956]; 53 Am. Jur., Trial §§ 464, 480; 88 C. J. S., Trial § 181a.)

The record leaves no doubt that during the county attorney's argument to the jury he held the statements of Garrett and Nason in his hand and read from them so as to give the jury the impression the statements were a part of the evidence. This was particularly prejudicial in regard to Nason, because he had not admitted making the contradictory portion of his statement.

The evidence was sharply conflicting, and it is apparent from the entire record that the credibility of the various witnesses was a matter of keen concern to the jury. At first glance it may seem the point in question is of little consequence and there could be no prejudice from the prosecutor's argument. The key to the defendant's case, however, was that the victim, while in a state of stupification, fell off the bench and cut his hand, and no crime was committed; and further, even if there was, defendant had no part in it, for he was busily engaged in his job working on the sewer line. The latter matter became an issue of great importance if the defendant's theory was to be sustained. By the county attorney's creating the false impression the statements were in evidence, his argument in reference to Nason's statement, for the purpose of impeachment, transcended all permissible bounds. Such tactics, if sanctioned, would permit counsel to read or refer to a writing *not in evidence* for the purpose of impeaching a witness on a vital issue in the case. While the same antics were employed in regard to Garrett's statement, and such practice cannot be condoned, the county attorney did limit his argument only to the portions Garrett admitted he made to the police.

Misconduct of the county attorney in closing argument will not always require the granting of a new trial (*State v. Lopez,* supra) unless such misconduct has resulted in prejudice to the extent that the accused has been denied a fair trial (*State v. Majors,* supra).

After carefully studying the record, we find it impossible to say the jury was not affected by the county attorney's argument tending to impeach Nason's credibility. The trial court erroneously overruled the defendant's objection to the argument. Not only should the court have sustained the objection, but the jury should have been admonished that the statements of the two witnesses were not in evidence, except for the isolated portions admitted by Garrett in his testimony.

Inasmuch as a new trial must be granted, we shall go further and consider defendant's other specification of error that under the evidence he could not be convicted of two separate, distinct offenses arising out of one criminal transaction. His argument, in essence, is that inasmuch as the same identical facts were relied on to prove both offenses, and the assault with intent to rob was an integral part of and necessarily included in the crime of first degree robbery, he could be convicted of only one offense. The point is well taken.

The state urges that the question is controlled by *State v. Aldrich,* 174 Kan. 335, 255 P. 2d 1027, where the identical contention now advanced was rejected by this court. The facts upon which the convictions rest are neither set forth in the body of the opinion, nor do we find them detailed in the abstracts on file. Albeit, it appears the question was not squarely determined; rather, it was disposed of on lack of prejudice, because the two sentences were ordered to run concurrently, with the result that defendant's term of confinement was no greater than had he been convicted of only one offense. The same disposition could be made under the facts here, but we regard the matter as one involving the legality of the sentences themselves. If upon retrial the defendant is again convicted of both offenses, his record will show two felony convictions where only one should be recorded.

Defendant directs our attention to *State v. McLaughlin,* 121 Kan. 693, 249 Pac. 612, wherein the accused was convicted of two offenses: being drunk and intoxicated on a public highway, and operating an automobile on a public highway while in a drunken and intoxicated condition. There the court upheld defendant's contention that being drunk on a public highway was an essential element of the offense of driving an automobile on a public highway while drunk, and that two distinct offenses could not be carved out of the single and identical delinquency. In reaching its decision, the court relied on the rule that a prosecution and conviction (or

acquittal) for some part of a single criminal delinquency bars another prosecution for the whole or any part of defendant's misconduct pertaining to that identical offense. The following language is found in the opinion:

"The criminal delinquency of defendant cannot justly or logically be carved into two distinct offenses carrying separate, distinct and successive punishments. Defendant's criminal conduct of being drunk in a public place was an integral part of the incident of driving his automobile. Being in a public place was not penal; driving an automobile was not penal. The ingredient of drunkenness in a public place was the vital and incriminating element in the constitution of either offense, but that element of drunkenness in public served its purpose and exhausted its potency in one conviction. It could not serve also as an ingredient to accomplish the conviction and punishment of defendant for another offense without doing violence to the simple facts of the case as well as the important constitutional principle involv ;d therein. (Const. Bill of Rights, § 10.)" (pp. 697-698.)

The foregoing principle had been expressed in the words of Mr. Justice Valentine long ago in *State v. Colgate*, 31 Kan. (2d Ed.) 511, 3 Pac. 346:

". . . a single offense cannot be split into separate parts, and the supposed offender be prosecuted for each of such separate parts, although each part may of itself constitute a separate offense. If the offender be prosecuted for one part, that ends the [prosecution] for that offense, provided, such part of itself constitutes an offense for which a conviction can be had. And generally we would think that the commission of a single wrongful act can furnish the subject matter or the foundation of only one criminal prosecution. . . ." (p. 515.)

Also, see *State v. Chinault*, 55 Kan. 326, 40 Pac. 662.

When an information charges the defendant with the commission of an offense of different degrees, he may be found guilty of that degree or any inferior degree, or of any offense included therein, or an attempt to commit the offense. (K. S. A. 62-1022, 62-1023.) As part of the constitutional guaranty against double jeopardy, when a defendant has been convicted or acquitted upon an information for an offense, such conviction or acquittal shall be a bar to another information for the former offense or for any lower degree of that offense, or for *an offense necessarily included therein.* (K. S. A. 62-1444.)

In the first count of the information the defendant was charged in the words of the statute (K. S. A. 21-527), which provides:

"Every person who shall be convicted of feloniously taking the property of another from his person or in his presence, and against his will, by violence to his person or by putting him in fear of some immediate injury to his person, shall be adjudged guilty of robbery in the first degree."

In the second count defendant was charged with having stabbed, or assaulted, or beaten Virgil Ballard with intent to rob him, in violation of K. S. A. 21-431, a part of which provides:

"Every person who shall, on purpose and of malice aforethought, . . . stab another, or assault or beat another, . . . with intent to . . . rob such person, . . . shall be punished. . . ."

Is the crime of assault with the intent to rob included in the offense of first degree robbery?

First degree robbery, under the statute, as well as at common law, may be committed by feloniously taking property from the person of another against his will, either by violence to his person or by putting him in fear of some immediate injury to his person. (*State v. Smith*, 113 Kan. 737, 216 Pac. 302.) Robbery has been said to be a combination of the crimes of assault and larceny. ( *State v. Fouquette*, 67 Nev. 505, 221 P. 2d. 404, cert. denied 341 U. S. 932, 95 L. Ed. 1361, 71 S. Ct. 799; 2 Wharton's Criminal Law and Procedure § 545.) K. S. A. 21-436 relates to the offenses of assault, and assault and battery in the language of "Any person who shall assault, or beat or wound another. . . ." An assault, although not defined by statute, has been described as an attempt or offer with force or violence to do corporal injury to another without the actual doing of the injury threatened, and neither actual intent nor actual present ability to do the injury threatened is necessary if the circumstances are such that the person threatened reasonably believes the injury will be done. (*State v. Hazen*, 160 Kan. 733, 165 P. 2d 234; *State v. Linville*, 150 Kan. 617, 95 P. 2d 332.) The robbery statute requires a felonious taking of property by violence or intimidation, and clearly contemplates that the offense be accomplished by an assault or assault and battery. The words "assault," "beat," "shoot at," "stab," "means or force likely to produce death or great bodily harm" are found in K. S. A. 21-431, and it is obvious that an assault is also an essential element of the offense of assault with intent to rob. In comparing the two offenses, we find assault with intent to rob characterized by practically the same features as are essential to the crime of first degree robbery, except that in robbery there must be a felonious taking of property.

It follows from the foregoing discussion that the offense of assault with intent to rob is included in the offense of first degree robbery, and under K. S. A. 62-1444 a conviction of first degree robbery would bar prosecution for assault with intent to rob when

the same act of violence or intimidation is relied on to sustain both convictions. (See, *State v. McClarity*, 180 Neb. 246, 142 N. W. 2d 152; *State v. Curtis*, 149 Ohio St. 153, 78 N. E. 2d 46; *People v. Allen*, 32 Cal. App. 110, 162 Pac. 401.)

In the instant case there was but a single act of violence or intimidation, and that act, which was an essential element of the robbery conviction, was also relied on as constituting the separate crime of assault with intent to rob. Under such circumstances, we hold that two separate convictions cannot be carved out of the one act of criminal delinquency. This situation is clearly distinguishable from those cases where a single criminal transaction constitutes two separate offenses because evidence required to prove the two offenses would not be the same. (See, *e. g.*, *State v. Brown*, 181 Kan. 375, 312 P. 2d 832 [first degree kidnapping and forcible rape]; *Wagner v. Edmondson*, 178 Kan. 554, 290 P. 2d 98 [assaulting a jailer and jailbreak]; *Wiebe v. Hudspeth*, 163 Kan. 30, 180 P. 2d 315 [statutory rape and incest].)

A nearly identical factual situation to that here was presented in *State v. Hill*, 44 N. J. Super. 110, 129 A. 2d 752, wherein the one criminal delinquency consisted of the forcible taking of the victim's coat. The defendant had been convicted of both robbery and assault with intent to rob. In holding that only the robbery sentence could be sustained, the court emphasized that there was but one criminal transaction, and that the facts which proved the robbery were the same as those relied on to prove the assault with intent to rob; the lesser offense was a component part of the greater, and a merger of the two arose upon conviction of the latter. It was further stated:

"The test to be applied in deciding the issue of merger is whether a particular act involved in a single transaction is a distinct criminal affair or an integral part of the principal offense charged. A prosecution for any part of a single crime bars any additional prosecution or sentence for the whole crime or any other constituent element of the whole crime. (Citing cases.)

". . . the record before us shows the commission of a robbery as the end result of a single criminal transaction. That robbery contained within it, as a step in the path to its perpetration, the offense of assault with intent to rob. . . . Therefore, only one sentence, and that for the major crime, was proper on the verdict of guilty as charged. . . ."

For cases of like import, see, *Ex parte Chapman*, 43 Cal. 2d 385, 273 P. 2d 817; *Zovick v. Eaton*, 259 App. Div. 585, 20 N. Y. S. 2d 447.

The judgment and sentence by the trial court on both counts is reversed with directions to grant the defendant a new trial.