(247 P.3d 686)
No. 100,362

In the Matter of the Care and Treatment of ROBERT C.
ONTIBEROS.

Opinion filed January 28, 2011.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Kris Ailslieger*, assistant attorney general, and *Marc Bennett*, special assistant attorney general, for appellee.

Before STANDRIDGE, P.J., GREEN and HILL, JJ.

HILL, J.:

## INTRODUCTION

Several times during the jury trial of this sexually violent predator case, in violation of the parties' agreement, the State's attorney used documents from an exhibit not admitted into evidence to cross-examine the respondent, Robert Ontiberos. The State's attorney also represented that a prison disciplinary report on Ontiberos involved a weapon when it did not. While this was unfolding before the jury, respondent's court-appointed lawyer never objected to any of the State's actions. Then counsel failed to offer evidence that bolstered the opinions expressed by the respondent's expert witness. The hallmarks of a fair trial are: an adequate hearing before a neutral tribunal; findings of fact based on legally admissible evidence relevant to the issues involved; and, a proceeding free from bias or prejudice. Based on the representations made by the State's attorney, combined with the inaction of respondent's counsel, we hold Ontiberos did not receive a fair trial. We reverse and remand for a new trial.

There is an order to our tasks. First, we examine and reject Ontiberos' claim that the Kansas Sexually Violent Predator Act is unconstitutional because it contains no way to contest the competence of his court-appointed counsel. After all, Ontiberos has successfully done just that in this appeal. Next, we point out that our Supreme Court has ruled that in prisoner habeas corpus actions, appointing an attorney should not be an empty gesture. By analogy, we hold that appointed attorneys in sexually violent predator cases must also be effective and competent. Then, we offer a brief review of the relevant trial testimony and examine the performances of the attorneys who tried this case.

*The Act is constitutional even though it contains no specific statute that allows a respondent to contest the competence of court-appointed counsel.*

Ontiberos argues the Kansas Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq.*, is unconstitutional because it does not provide a remedy for the effects of inept counsel. Because there are other methods to test the effectiveness of court-appointed counsel, such as the procedure followed in this case, we reject Ontiberos' argument. Reasoning by analogy, first from criminal appeals and then from prisoner habeas corpus actions, we hold court-appointed counsel in these predator actions must be effective and competent. Next, we hold the Act does not violate the constitution simply because it contains no specific method for redressing the incompetence of court-appointed attorneys.

We first fix the platform from which we base our reasoning. Obviously, the United States Supreme Court has twice examined and approved the procedures of the Kansas Act. See *Kansas v. Crane*, 534 U.S. 407, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002); *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997). Notably, one of the significant characteristics of actions under the Kansas Sexually Violent Predator Act is that they are *civil* in nature. *Hendricks*, 521 U.S. at 369. Therefore, respondents resisting commitment do not have a constitutional right to counsel but do have a *statutory* right. See K.S.A. 59-29a06(b); *Brown v. State*, 278 Kan. 481, 483, 101 P.3d 1201 (2004). But does this really make a difference?

In our view, if a statute compels a court to appoint counsel to represent anyone indigent, then that counsel should perform competently. It should not make any difference who is paying the attorney's fee. For example, in criminal appeals, where there is a statutory right to counsel, the United States Supreme Court held that due process requires effective appointed lawyers: "A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S. Ct. 830, 83 L. Ed. 2d 821, *reh. denied* 470 U.S. 1065 (1985). So, in direct

criminal appeals, due process of law requires the effective assistance of an appointed attorney, even though that attorney is appointed because a statute requires the appointment. The Kansas Supreme Court adopted this holding in *Laymon v. State*, 280 Kan. 430, 439-40, 122 P.3d 326 (2005).

Going further, courts have extended this principle from criminal cases to prisoner habeas corpus actions. When analyzing the right to counsel in proceedings under K.S.A. 60-1507, our Supreme Court recognized that when there is a statutory right to counsel, there is, *by necessity*, a right to effective counsel. The court noted the appointment of counsel would be a useless formality if counsel were not required to be effective and competent. *Brown*, 278 Kan. at 484. The court reiterated *Brown's* holding in *Robertson v. State*, 288 Kan. 217, 228, 201 P.3d 691 (2009). We see merit in applying the *Brown* ruling here.

*Court-appointed counsel must be effective and competent in sexually violent predator cases.*

Both the prisoner habeas corpus procedures and the sexually violent predator statutes compel the court to appoint counsel for those requesting help. In fact, in sexually violent predator cases, the law requires appointment of counsel *at all stages* of the proceedings, while the law requires appointment of counsel in habeas corpus cases only after the prisoner has shown the court a substantial issue of law or fact; thus, compelling the court to appoint counsel. See K.S.A. 59-29a06; K.S.A. 22-4506. The policy set out in *Brown*, requiring effective assistance and providing a remedy for counsel's failure to provide such assistance, is equally applicable here. To rule otherwise would make the appointment of counsel in these cases a useless gesture. We hold that because there is a statutory right to counsel in sexually violent predator proceedings, there is a correlative right to effective counsel and a remedy for counsel's failure in that regard.

We look now at the possible methods to test the performance of counsel and to provide a remedy for their incompetence, if necessary. First, there is habeas corpus relief under K.S.A. 60-1501. Our Supreme Court has ruled a person confined as a sexually vi-

olent predator can seek the redress of due process violations by using this law:

"K.S.A. 60-1501 allows any person confined in Kansas to prosecute a writ of habeas corpus in the county in which such restraint is taking place. Based on the broad language of K.S.A. 60-1501, a person confined in Kansas' Sexual Predator Treatment Program is included within the purview of K.S.A. 60-1501, and, as a result, may bring a habeas corpus petition alleging *due process violations*." (Emphasis added.) *Johnson v. State*, 289 Kan. 642, Syl. ¶ 1, 215 P.3d 575 (2009).

Logically, if part of the legal process due a respondent in a sexually violent predator case is the appointment of *effective* competent counsel, failure to provide such assistance would be a due process violation. For if it is a due process violation to have ineffective appellate counsel for a criminal appeal, then it must be a due process violation to have ineffective counsel in sexually violent predator proceedings. Thus, we disagree with Ontiberos' claim to the contrary in his brief. Such questions are valid subjects for habeas corpus petitions.

*We look at the steps taken in this case to determine attorney effectiveness.*

When Ontiberos raised the question of the competence of his attorney at the start of this appeal, this court used a method frequently employed in criminal cases to deal with the issue of appointed attorney effectiveness. In cases where there is an issue of court-appointed counsel's competence raised by the appellant, our Supreme Court in *State v. Van Cleave*, 239 Kan. 117, 119-20, 716 P.2d 580 (1986), adopted a remand procedure which avoids the delay and expense of a separate action under K.S.A. 60-1507 and a separate appeal. Accordingly, in such cases, this court delays acting on the appeal and we remand the matter to the district court for the limited purpose of making inquiries and findings about the effectiveness of counsel. If the court finds counsel was effective, the case returns to the appellate court and any issues arising from the remand proceedings are included in the briefing and are subject to the final ruling of the court.

By using the *Van Cleave* procedure here, Ontiberos has had the opportunity to contest the efficacy of his counsel and obtain ap-

pellate review of the district court's ruling on the matter. Since such a remand procedure was made available, the question of attorney competence can be raised and adjudicated under accepted principles of due process of law.

Finally, on this point, Ontiberos' claim that the Act is unconstitutional is a logical fallacy because it argues from the specific to the general. After all, if someone convicted of theft has suffered from the incompetence of court-appointed counsel, it does not follow that the criminal code is unconstitutional because there is no provision within the code to test the effectiveness of appointed counsel. Likewise, if ineffective court-appointed counsel prejudices a respondent in a sexually violent predator case, it does not follow that the Sexually Violent Predator Act is unconstitutional. We know of no law or court ruling requiring an act of the legislature to contain a method for contesting the effectiveness of appointed counsel before that act can pass constitutional muster. The competence of an attorney's performance is determined in each case. To make such an assessment, a court requires no legislative authority to act, since such a determination is typically a part of what the court must decide when addressing due process questions.

We move now to what happened during the jury trial and recount points of evidence that are pertinent to our ruling.

*The State alleged in the petition that Ontiberos must be committed.*

When the State sought to commit Ontiberos for treatment as a sexually violent predator, it claimed he had convictions for two sexually violent crimes: an attempted rape in 1983 and an aggravated sexual battery in 2001. Also, the State asserted Ontiberos' sexual activities were caused by a mental abnormality or personality disorder making it difficult for him to control his behavior. Also, the State contended he was likely to reoffend and that his release from prison was imminent.

*The parties agreed to have a great number of documents available for the experts at the trial.*

As the trial was starting, the State's attorney, Special Assistant Attorney General Marc Bennett, and Ontiberos' attorney, Greg

Barker, stipulated to the foundation of almost 3,000 pages of records relied on by doctors in evaluating Ontiberos. These documents included police reports, records of prior legal proceedings, Department of Correction records, and mental health records. The parties agreed to admit the documents for the limited purpose of an appellate record and the possible use by either of the two doctors who were going to testify:

"THE COURT: . . . Mr. Bennett, you have some documents that you wish to have admitted for the purposes of the record, but not to be submitted for the jury's consideration; is that an accurate statement?

"MR. BENNETT: That's correct, Your Honor. The case—or excuse me, the statutory authority for the testimony of an expert requires that they be—any records about which they are testifying, they need to be able to be presented with those documents in Court. And so by agreement of the parties, before we began, there was a stipulation to both foundation for those records and then, also, *that they would be admitted for the appellate record only*, in the event that either doctor needs to be presented with something admitted.

. . . .

"THE COURT: Mr. Barker, do you have any objection to the admission of Exhibit 1?

"MR. BARKER: No. Pursuant to the stipulation as just announced, with—and those limitations, no objection.

"THE COURT: And just so that the record will be clear, although the exhibit is being admitted for the purpose of the record, the Court does not intend to take actual possession of the exhibit, we'll have it remain in the possession of Mr. Bennett and in the event an appellate record may later be needed, it will be available by Mr.—well, through Mr. Bennett." (Emphasis added.)

The court admitted the records collectively as Exhibit 1. (Individual pages within the exhibit were numbered.) After identifying Exhibit 1, the parties offered testimony.

*The State calls one witness, a psychologist who had evaluated Ontiberos.*

The State called Dr. Deborah McCoy, a clinical psychologist employed at Larned State Hospital. Dr. McCoy evaluated Ontiberos by reviewing his prison records, all of his psychological evaluations, and by conducting a personal interview. Also, she gave two "actuarial-risk" tests to Ontiberos. Based on all of this, McCoy reported that Ontiberos had substance abuse problems and had at-

tended seven drug and alcohol treatment programs over the years. Also, because of his sex crimes, Ontiberos had engaged in two sex offender treatment programs. Dr. McCoy then told the jury about Ontiberos' crimes.

There were two actuarial-risk assessment tests, the first called the Static-99 and the second known by the acronym MnSOST. According to the Static-99 test, Ontiberos' chances of reconviction were 39 percent after 5 years, 45 percent after 10 years, and 52 percent after 15 years. In Dr. McCoy's view, this put Ontiberos in the high-risk category. The MnSOST test results placed Ontiberos in a moderate risk category. That test predicted Ontiberos had a 29 percent chance of rearrest for a sexual offense. The testimony then moved on to Dr. McCoy's diagnosis.

Dr. McCoy's diagnosis of Ontiberos was paraphilia not otherwise specified, with themes of exhibitionism and nonconsent, as well as a personality disorder not otherwise specified, with antisocial features, polysubstance dependence, and sexual abuse of an adult. She noted that Ontiberos' paraphilia and personality disorder were both "not otherwise specified," meaning the conditions did not fit into specific diagnostic categories found in the Diagnostic and Statistical Manual of Mental Disorders, DSM-IV. Dr. McCoy testified that while Ontiberos' substance abuse was part of his inability to control his sexual behavior, it was not the cause of that behavior. Finally, Dr. McCoy ended by saying that she believed Ontiberos could be deemed a sexually violent predator.

*Ontiberos presented the testimony of two witnesses.*

Ontiberos testified about his crimes. Regarding the 2001 aggravated sexual battery of his mother-in-law, Ontiberos said he had been drinking and smoking crack cocaine with his father-in-law and that his father-in-law suggested that Ontiberos have sex with his mother-in law. Ontiberos repeated his claim that he did not remember the details of his assault on his mother-in-law. Ontiberos admitted he is an alcoholic and a drug addict but believed he could lead a productive life so long as he abstained from drugs and alcohol and kept himself in a positive environment. Ontiberos expressed remorse for his offenses, as well as a desire to continue

substance abuse treatment. Next, the State proceeded with his cross-examination.

State's attorney Bennett cross-examined Ontiberos about his crimes and his mental health treatment history. Bennett used several documents from Exhibit 1 during much of his cross-examination. For example, Bennett first questioned Ontiberos about his version of the attempted rape conviction in 1983 and contrasted Ontiberos' version with that contained in the bill of details filed by the Ford County district attorney. Bennett worked to undermine Ontiberos' credibility by challenging his asserted lack of memory of the assault. Bennett also challenged Ontiberos' characterization of the victim as a close friend with whom he had had prior sexual relations by referring to a 1983 clinical evaluation that said the victim was a "casual acquaintance." Ontiberos testified that he did not remember telling the psychiatrist in 1983 the victim picked up a knife. Bennett did not limit his use of documents from Exhibit 1 to the bill of particulars. He used other records as well.

Bennett relied on a police affidavit from Exhibit 1 while questioning Ontiberos on the 2001 offense. He twice asked Ontiberos about his recollection of telling police that he either "wanted to get some pussy" or "was going to get some pussy." When questioning Ontiberos' recollection, Bennett again asked him about yelling, "I want sex, I want pussy." Ontiberos stated that he did not remember saying that.

Next, Bennett confronted Ontiberos with a Department of Corrections document from Exhibit 1 in which Ontiberos gave his version of the 2001 assault. The document indicated that Ontiberos blamed his father-in-law for the incident and he refused to take responsibility for his conduct. Ontiberos testified that he has since taken responsibility for his actions.

Once again, Bennett used a document from Exhibit 1 when he asked Ontiberos about a 1991 report that indicated his dissatisfaction at having to undergo sex offender treatment since he had previously completed treatment. Ontiberos testified that he was indeed unhappy to have to undergo treatment again.

Bennett then questioned Ontiberos about inconsistencies between his criminal history and what he told Dr. Barnett. Ontiberos

testified that he told Dr. Barnett he had not been accused of any sexual offenses other than those in 1983 and 2001. Bennett then cross-examined Ontiberos about several uncharged sexual incidents that occurred in 1983, 1991, 1998, and 1999, again using records from Exhibit 1.

The final witness was Dr. Robert Barnett, a clinical psychologist who had evaluated Ontiberos. Dr. Barnett based his evaluation of Ontiberos on an interview, Ontiberos' clinical history, a mental status exam, and some "short testing," as well as a review of all of his records from Larned State Hospital. Dr. Barnett diagnosed Ontiberos with "chronic and severe polysubstance abuse and dependence" and a mild cognitive disorder.

Respondent's counsel, Barker, asked Dr. Barnett if the cross-examination of Ontiberos affected his evaluation. It did not. The psychologist said that although Ontiberos appeared truthful during the interview, he noted that most defendants omit or sugarcoat certain facts and he considers those while making his evaluation. Dr. Barnett testified that he did not believe Ontiberos had a sexual dysfunction diagnosis and the incidents disclosed to him for the first time in the cross-examination of Ontiberos would have no effect on his diagnosis because it appeared to him that all of these incidents occurred while Ontiberos was intoxicated. Dr. Barnett maintained that substance abuse, not sexual dysfunction, was the problem.

Then, Dr. Barnett talked about the actuarial risk assessment tests conducted by Dr. McCoy. He testified that these tests aggregate historical data and group people together based upon similarities in their backgrounds to predict future behavior. The problem with such tests, Dr. Barnett said, is that the prediction is "basically nonsense." For example, Dr. Barnett stated that in a hypothetical group where an offender is predicted to have a 50 percent chance of reoffending, it is impossible to determine whether a specific offender will be in the half that reoffends or the half that will not. He testified further that both tests often come up with different scores for the same person and have limited utility because they only account for static traits and have no mechanism to reflect

personality or psychological changes over time. Consequently, Dr. Barnett believed that both tests are misleading.

On cross-examination, Dr. Barnett stated that Ontiberos had not told him about some uncharged sexual incidents in 1983, 1991, and 1999. The State's attorney also asked if Ontiberos had told Dr. Barnett about a 2003 prison incident where Ontiberos fashioned a knife out of a pen and duct tape. Dr. Barnett said this was new information to him but if it was done while Ontiberos was intoxicated, it would not change his opinion that Ontiberos suffered from substance abuse issues rather than a sexual disorder. Dr. Barnett then repeated his disapproval of the actuarial risk tests. Dr. Barnett concluded that if Ontiberos stayed sober, he would be all right but "he's a threat to the community" if he did not.

*After the appeal was docketed, we remanded the case for a determination by the trial court of the effectiveness of trial counsel.*

Prior to briefing, Ontiberos filed a motion to remand the case to the district court for a *Van Cleave* hearing and rule on Ontiberos' newly asserted claim of ineffective assistance by his trial counsel Barker. The motion alleged that Barker stipulated to the admission of otherwise inadmissible hearsay evidence and allowed that evidence to be used against Ontiberos. We granted the motion and, while retaining jurisdiction, remanded the matter to the district court to make further inquiries. We recount this proceeding in order to report the statements the two attorneys offered the district court as an explanation for their conduct at the trial.

On remand, the district court entertained evidence on the ineffective counsel claims. First, State's attorney Bennett testified that he and Ontiberos' attorney, Barker, had agreed to stipulate to the admission of Exhibit 1 prior to trial. According to Bennett, they made the stipulation so that both attorneys would be able to confront the expert witnesses with the documents they relied upon in evaluating Ontiberos. Bennett stated that although much of the material in Exhibit 1 may have been hearsay, he was prepared to call witnesses to establish foundation for the evidence so that it could be admitted independently. Bennett also said that both he and Barker wanted to avoid calling so many witnesses, including

the victims of prior crimes, to lay foundation. Bennett testified that he had sent an email to Barker stating that he intended to introduce Ontiberos' prior uncharged offenses, asking Barker if he had any hearsay objection, and informing Barker that he was prepared to introduce foundation evidence. A copy of that email was admitted at the remand hearing but is not included in the record on appeal. Bennett admitted he confronted Ontiberos with documents from Exhibit 1 during cross-examination. Finally, upon review of Exhibit 1, Bennett admitted that he was unable to locate any reference to a 2003 disciplinary report that alleged Ontiberos used a knife in a prison fight.

Ontiberos testified he has never received a disciplinary report involving a weapon.

Barker testified that he stipulated to the admission of Exhibit 1 because he "didn't want to have up to maybe half-a-dozen other prosecution witnesses coming in essentially piling on cumulative evidence, which in [his] opinion would have been devastating to [Ontiberos'] case." Barker recalled Bennett's use of documents from Exhibit 1 during his cross-examination of Ontiberos but did not believe that Bennett violated the stipulation by doing so. He stated that the two attorneys had stipulated to foundation and Bennett "asked questions of a historical or factual nature" that were not objectionable.

Barker also testified about his defense tactics. Barker intended to undermine the validity of the Static-99 risk assessment test because he did not believe that it was an "accurate . . . determinative tool." He discussed the strategy with his expert, Dr. Barnett. He relied on Dr. Barnett's expertise to execute his plan of attack. Barker stated that he reviewed Exhibit 1 for any information that might be helpful to Ontiberos' defense but found nothing. During the remand hearing, Ontiberos' current counsel presented Barker with a prior Static-99 assessment found in Exhibit 1 that indicated a lower risk than that predicted by Dr. McCoy. Barker explained why he did not use the results. Barker testified that the strategy he and Dr. Barnett had devised to attack the validity of the test itself dictated that he could not attack one score and then present another more favorable score as if it were accurate. According to

Barker, "It's either a reliable system or it isn't, and we all have to chose [*sic*] tactics in our trials. I chose the tactic of attacking the very validity of the Static-99 itself." Barker also testified that he had, at best, a rudimentary understanding of the workings of the Static-99 and relied on Dr. Barnett in forming his argument about the test's reliability. Barker testified that another aspect of his strategy was to argue that Ontiberos' conduct was caused by alcohol and drug addiction rather than a sexually related mental abnormality.

The district court denied Ontiberos' ineffective assistance of counsel claim, finding that Barker made the stipulation to Exhibit 1 after thorough consideration. Further, even if there was no stipulation, the foundation for the documents in Exhibit 1 could have been proven and the documents admitted anyway. The judge noted that Barker had pointed out inconsistencies in the actuarial risk assessments. Finally, the court held that Barker's representation was not deficient or prejudicial to Ontiberos.

*Ontiberos has a right to a fair trial.*

Even though someone committed for treatment under the Kansas Sexually Violent Predator Act may remain in treatment for the rest of his or her life, such an outcome does not equate with criminal punishment because the Act does not seek retribution or deterrence. *Hendricks*, 521 U.S. at 361-62. Therefore, due to the unique position sexual predator actions have in our jurisprudence, courts do not apply many of the rules that traditionally arise from criminal procedures to those cases.

For example, complaints of prosecutorial misconduct, common in our criminal jurisprudence, are inappropriate in sexually violent predator proceedings. *In re Care & Treatment of Foster*, 280 Kan. 845, 853, 127 P.3d 277 (2006). Consequently, the two-step analysis taken in criminal prosecutorial misconduct claims is inapplicable here. *Foster*, 280 Kan. at 853; see *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009). The State complains in its motion for rehearing that we fail to establish our standard of review for this question. Obviously, since we do not address the question we

need not establish a standard of review. We look instead at whether the respondent received a fair trial.

An attorney's conduct, even in the absence of an objection, can be the cause of the reversal and remand of a civil case for a new trial. In *Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P. 2d 1062 (1973), our Supreme Court held attorney conduct becomes reversible error when someone is denied a fair trial due to that conduct:

> "Under what circumstances do remarks of counsel result in reversible error? An uncontradictable answer must be: they are reversible error when, because of them, the parties have not had a fair trial. Factors necessary to a fair trial are an adequate hearing before an impartial tribunal *based on legally admissible evidence* relevant to the issues involved, free from bias or prejudice." (Emphasis added.) 213 Kan. at 96.

Notably, a fair trial was the concern of our Supreme Court in *Foster*, where the court held that in a sexually violent predator proceeding, remarks by counsel might result in reversible error when those remarks have deprived the respondent of a fair trial. 280 Kan. at 857. While not establishing a clear test for making such a determination, *Foster* indicates that prejudice to the respondent is the central consideration in such a case. 280 Kan. at 861. We will follow the instruction found in *Foster*.

We hold the ruling in *Foster* controls the first matter we must deal with—the lack of an objection by Ontiberos to the conduct of the State's attorney. Simply put, Ontiberos did not object to Bennett's violation of their stipulation to the limited use of Exhibit 1 at trial. In criminal cases, this failure would be fatal to Ontiberos' claims. See *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). But those standards do not apply here. To the contrary, *Foster* indicates the failure of the defense to lodge a contemporaneous objection to alleged misconduct is not fatal to an appellate review of such a claim. 280 Kan. at 854; see also *In re Care & Treatment of Ward*, 35 Kan. App. 2d 356, 374-75, 131 P.3d 540, *rev. denied* 282 Kan. 789 (2006) (applying the ruling in *Foster* and holding that conduct not objected to could be considered on appeal).

The State argues in its motion for rehearing that our view of the holding in *Foster* is too broad. In the State's view, the fair trial

holding in *Foster* must be limited to cases of impermissible opening comments of the prosecutor. Thus, the State tries to confine the *Foster* holding to a category of cases where the Supreme Court has long held that such comments may be reviewed on appeal even if there is no contemporaneous objection. We find this argument unpersuasive for two reasons. First, nothing in the language used in *Foster* indicates the Supreme Court wanted to limit its ruling to impermissible opening remarks. To the contrary, the *Foster* court specifically stated:

> "Most important, however, we observe that this court has held that attorney misconduct can require reversal in purely civil cases. *Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P.2d 1062 (1973), contains some parallels. There, even though defense counsel had not objected, this court reversed and remanded for a new jury trial in a personal injury case *because of the opposing counsel's conduct*, including improper statements in closing argument." (Emphasis added.) 280 Kan. at 854.

Second, even if we agreed with the State and held that *Foster* applied only to impermissible opening comments—then the lack of so many objections demonstrates an unacceptable level of incompetence on the part of Ontiberos' court-appointed attorney. The resulting prejudice to Ontiberos is obvious. Thus, the result here is the same—Ontiberos did not receive a fair trial. In sum, we choose not to read some artificial limit into the Supreme Court's holding in *Foster*. Instead, we choose to follow the directions of the court. We examine the entire trial to see if the respondent was prejudiced. The question we address is whether Ontiberos received a fair trial.

*Ontiberos complains about the State's use of Exhibit 1.*

Ontiberos correctly asserts Exhibit 1 was introduced for the limited purpose of providing the two expert witnesses access to documents they may have used in evaluating Ontiberos. Also, the documents would be available for the appellate record. The record clearly shows the documents were not meant for the jury. During the remand hearing, both attorneys said they made this stipulation to avoid calling several witnesses to establish foundation testimony for all of the documents in Exhibit 1. But the fundamental fact is

clear; the documents contained in Exhibit 1 were not admitted into evidence and the State's attorney used them to cross-examine Ontiberos and his expert witness as if they were. The court explicitly stated the documents were not to be considered by the jury. We believe the prejudicial use of these records by the State was improper and denied Ontiberos a fair trial. Above all, the use of legally admissible evidence relevant to the issues is a hallmark of a fair trial. See *Smith*, 213 Kan. at 96.

The general rule concerning the limited admission of evidence is found at 88 C.J.S., Trial § 179. "If admissible evidence is offered or received for a limited purpose, *the evidence is admitted only for the limited purpose specified, and cannot be relied on for another purpose.*" (Emphasis added.) Here, Exhibit 1 was marked and admitted for the limited purpose of the appellate record only. By stipulation of the parties, it was not to be submitted to the jury. Apparently, either of the doctors who testified could be questioned about the documents but the stipulation stops there.

The State used Exhibit 1 to cross-examine Ontiberos. Fundamental fairness calls for evidence to be presented in open court through the application of correct legal procedures where it can be tested by adversarial examination. In *State v. Gauger*, 200 Kan. 515, 520-21, 438 P.2d 455 (1968), *disapproved on other grounds in State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), the court dealt with prior inconsistent statements and held:

"Where the impeaching statement is written, and the witness, although admitting that he gave a statement, cannot remember the contents thereof, or will neither admit nor deny the same, there is ample foundation for admitting the statement itself or at least the impeaching portion thereof into evidence. [Citations omitted.] . . .

". . . Counsel may comment on the credibility of a witness where his remarks are based on facts *appearing in the evidence; but it is highly improper for the court to permit counsel to read or even refer to the contents of written matter not in evidence for the purpose of impeachment.*" (Emphasis added.)

While dealing with prior inconsistent statements of two witnesses, the court reported that the record on appeal in *Gauger* did not disclose that either witness had an opportunity to look at or identify the written statement allegedly given by him to the police.

The contents of the purported statements were revealed only in the form of questions read by the county attorney in cross-examining the witnesses. That is very similar to what happened in this case.

The most striking example of the improper use of the documents occurred when the State's attorney cross-examined Ontiberos about uncharged sexual incidents in 1983, 1991, 1998, and 1999. The 1983 incident allegedly occurred at a residence in Dodge City where Ontiberos took off his clothes in the presence of a couple and made sexually obscene comments about the wife. Relying on a police report, Bennett then asked Ontiberos about an incident in 1991, where Ontiberos was accused of standing naked on a woman's porch and looking through the sliding glass door. Next was an uncharged sexual assault Ontiberos allegedly committed against his wife in 1998, where an intoxicated Ontiberos allegedly tried to have sex with his wife against her will. Finally, the attorney questioned Ontiberos about a 1999 incident where he approached a woman at her residence and told her, "I want some pussy." None of these reports were admitted into evidence.

If the State wanted to use these documents to impeach Ontiberos, they should have been offered for that purpose. The broad rule found in 88 C.J.S., Trial § 181, states: "Where evidence is offered and admitted for the purpose of impeachment, it must be restricted to such purpose." Every one of those reports may be true and accurate, but the only way to legally determine if that is so is by following the proper procedures for admitting the reports into evidence, having an adversary question them, and then allow the jury to give them whatever weight they deserve.

We certainly understand that one of the acceptable techniques of impeachment is cross-examination of a witness about a prior inconsistent statement. But there are rules that must be obeyed. The two statutes dealing with the credibility of witnesses contemplate the admission of impeaching statements into evidence. K.S.A. 60-420 provides:

"Subject to [limitations about the use of criminal convictions] for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness *and introduce* extrinsic evidence

concerning any conduct by him or her and any other matter relevant upon the issues of credibility." (Emphasis added.)

Then, in K.S.A. 60-422, the statute states:

"As affecting the credibility of a witness . . . (b) extrinsic evidence of prior contradictory statements, whether oral or written, made by the witness, may in the discretion of the judge *be excluded unless the witness was so examined while testifying as to give him or her an opportunity to indentify, explain or deny the statement.*" (Emphasis added.)

Finally, in its motion for rehearing, the State argued that this process of stipulating to and admitting the respondent's records before trial has been approved by the Supreme Court. Therefore, according to the State, our prior opinion in this case which was critical of the State's actions is somehow contrary to the Supreme Court's holding in the case styled, *In re Care and Treatment of Colt*, 289 Kan. 234, 211 P.3d 797 (2009).

Indeed, in *Colt*, the State sought Colt's indefinite civil commitment as a sexually violent predator. The parties stipulated to Colt's criminal convictions as well as to the foundation of records of Colt's criminal and medical history. We must point out here that Kansas courts follow the traditional rule that experts' opinions based upon hearsay are not admissible in any court proceeding. *Colt*, 289 Kan. at 243. In other words, if an expert relies upon reports to form an opinion, those reports must fall within one of the hearsay exceptions. When Colt, on appeal, complained about the hearsay nature of his records and their use by the experts in his case, the Supreme Court held it was irrelevant whether the documents used were admissible under a hearsay exception:

"Our review reveals that the parties not only stipulated to their foundation but also agreed that the records' admission was unnecessary, as concerns about their content could 'be appropriately addressed simply by asking [the expert] to refer specifically to the specific record if he has testified about something that he claims is from the record.'

. . .[T]his agreement appears to have eliminated any useful purpose our enforcement of the rule might serve; waived any initial objection to [the expert's] reliance on and reference to the records; and, to the extent admission of his opinion was error, invited it." 289 Kan. at 243.

We do not view that remark as a statement of approval of this procedure as the State argues, but rather, it is a statement of the court's reason for refraining from ruling on the alleged error.

Superficially, then, the facts in *Colt* are similar to this case in that the parties stipulated to the foundation of Ontiberos' medical, mental, criminal, corrections, and treatment records for the purpose of expert evaluation. But the State fails to mention that the uses made of these documents are drastically different in the two cases. In *Colt*, the records were limited to use by the expert in forming his opinion of Colt's mental health status. In Ontiberos' case, the State used a number of these documents to impeach Ontiberos without properly admitting them for the purposes of impeachment and outside the stipulation made in open court. The use of evidence outside the stipulation was never an issue in *Colt* as it is here. We find the State's argument on this point unpersuasive. As a result, the State used documents not admitted into evidence in the trial of Ontiberos. That does not comport with the concept of a fair trial found in *Smith*.

*Ontiberos complains about the State mischaracterizing a disciplinary report.*

Ontiberos argues the State used a nonexistent prison report to cross-examine his expert, Dr. Barnett. In fact, in its brief the State conceded the point and told us the prison disciplinary report did not exist:

"Upon review of the State's file, the State can find no reference to the use of a handmade knife in the disciplinary reports made against Respondent during his incarceration. In short, it appears State's counsel made a mistake. Whether based on another case that counsel mistook for the instant matter or, the misapplication of some other reference to the use of a knife by Respondent in the 3000 pages of discovery—the question to Dr. Burnett [*sic*] regarding Respondent having received a disciplinary report for the use of a knife was in error."

Then, after receiving our opinion criticizing the use of nonexistent evidence, the State claimed to have "found" the report buried in Exhibit 1 and asked us to rehear the matter. In the interests of justice, we did so.

The "found" document does not refer to a knife. It does report a disciplinary action taken by a prison official against Ontiberos in 1991 for having an ink pen with duct tape wrapped around it. The report concluded it was "less dangerous" contraband according to prison rules.

We cannot ignore the State's exaggeration of this report. Counsel asked Dr. Barnett, who was testifying for Ontiberos, about a 2003 prison incident where Ontiberos fashioned a knife out of a pen and duct tape. Assuming for the sake of the State's argument this time that this "found" document is the report that serves as the basis for the State's question, we see two obvious errors; the date of the incident and calling the contraband a knife. Ontiberos' sexually violent predator jury trial was held in March 2008 and for the State's purposes, 2003 is far more recent than 1991. After all, something that happened just 5 years earlier may be more significant to a jury than an event 17 years earlier. Then, obviously, the State's attorney characterizes the object as a knife. This name for the object makes a much more violent impact than the "less than dangerous" contraband conclusion of the authorities who actually dealt with the object. It is clear that this leading question was not based on fact.

*The attorney for Ontiberos passively allowed the State's attorney to proceed in apparent violation of the stipulation.*

We note that Barker refrained from objecting the 12 times the State used the documents in Exhibit 1 in violation of their agreement. By doing so, the State was given free rein to use reports meant only for the appellate record and not the jury. The State counters that it could have called all of the foundation witnesses necessary to admit the documents into evidence; thus, these violations of the stipulation were harmless error. The district court made a finding that the State could have called all of the foundation witnesses. We find it unpersuasive to speculate about what the State could have done. We must deal with what the State did. The State improperly used statements that had not been admitted into evidence to impeach a witness. This is clearly in violation of the ruling in *Gauger*, 200 Kan. at 520-21.

In addition to failing to object to the improper use of Exhibit 1, Barker failed to object to the State's cross-examination of Dr. Barnett about the disciplinary report concerning a knife when there is no report of a knife, but merely a report of "less than dangerous" contraband. In a case where the burden is upon the State to show the jury that someone is violent, a report from just 5 years ago makes a much greater impact than one 17 years earlier. Perhaps Barker was unaware of the report.

Going further, Barker's failure to use test results properly is troubling. Among the materials in Exhibit 1 is a sexual offender treatment program discharge summary from 2006. According to that report, Ontiberos' score on the Static-99 test indicated that he had a 9 percent risk of being reconvicted within 16 years. Dr. McCoy's report indicated that Ontiberos had a 39 percent chance of being reconvicted within 5 years and a 52 percent chance of reconviction in 15 years. The use of this report would have verified his own expert's assertion that these two tests often come up with different scores for the same person. This use of the report would have been consistent with his basic strategy of discrediting the actuarial tests used by Dr. McCoy. Also, such a use of the report would have been consistent with the stipulation to Exhibit 1.

Along this same line, we must point out that Dr. Barnett testified that the penile plesythmograph is a more accurate test than the Static-99 test. When Dr. Barnett testified that he did not have access to a plesythmograph and did not understand why the test was not used at Larned State Hospital, counsel for Ontiberos failed to show him data from a plesythmograph test performed on Ontiberos in 2005. We will not speculate what Dr. Barnett's response would have been had he seen the results, but the fact that counsel did not question him about the results calls into question counsel's pretrial preparation in this regard. Obviously, such a line of inquiry would be consistent with counsel's avowed strategy of casting doubt on the validity of the tests used by the State's expert.

In light of all of this, we must conclude that Ontiberos' court-appointed counsel was not effective. With the resulting prejudice to Ontiberos, the only conclusion we can reach is that he did not receive a fair trial.

We reverse the district court and remand the matter for a new trial.